**GLEN HOLLY ENTERTAINMENT INC., a California Corporation dba Digital Images, Plaintiff–Appellant,**

v.

**TEKTRONIX INC., an Oregon Corporation; Avid Technology, Inc, a Delaware Corporation, Defendants–Appellees.**

No. 01–56447.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 2002.

Filed Sept. 9, 2003.

Amended Dec. 12, 2003.

Jeffrey T. Makoff, Makoffs LLP, San Francisco, CA, for the plaintiff-appellant.

Stanley M. Gorinson, Kilpatrick Stockton LLP, Washington, DC, for the defendants-appellees.

James C. Burling, Hale & Dorr, LLP, Boston, MA, for the defendants-appellees.

Before REINHARDT, TROTT and SILVERMAN, Circuit Judges.

### ORDER AMENDING OPINION AND DENYING PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC AND AMENDED OPINION

TROTT, Circuit Judge.

### ORDER

The Opinion filed on September 9, 2003, and published at 343 F.3d 1000 (9th Cir. 2003) is amended as follows:

Footnote 4 appearing on page 1013 is deleted and replaced by new footnote 4, which reads as follows:

Nor is it (1) *Hairston v. Pacific 10 Conference*, 101 F.3d 1315 (9th Cir.1996) (where antitrust standing was questionable and where the plaintiffs failed to "offer even the thinnest reed of support to meet their burden of proof that the defendants procompetitive objectives could be achieved in a substantially less restrictive manner"); (2) *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139 (9th Cir.1989) (en banc) where there was no agreement to restrict the output of the product "in the market" and no anticompetitive effect demon-

strated with respect to the alleged restraint; or (3) *ARCO v. U.S.A. Petroleum,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (one competitor held not to have demonstrated antitrust injury from rival's vertical, maximum price fixing agreement).

With this amendment, the panel as constituted above has voted to deny the petition for rehearing, and to deny the petition for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc and no judge of the court has requested a vote on it. Fed. R.App. P. 35(b).

The petition for rehearing and the petition for rehearing en banc, are DENIED.

## OPINION

Glen Holly Entertainment Inc. ("Digital Images") brought this private antitrust action, with supplemental state law claims, against Tektronix Inc. ("Tektronix") and Avid Technology, Inc. ("Avid"), collectively ("defendants"). Pursuant to defendants' Rule 12(b)(6) motion, the district court dismissed Digital Images' antitrust and promissory estoppel claims, as well as some of its fraud and negligent misrepresentation claims. The court concluded that Digital Images lacked "antitrust standing" in that the injury alleged did not qualify as "antitrust injury." The district court subsequently granted summary judgment in favor of the defendants on Digital Images' remaining fraud and negligent misrepresentation claims. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part, and reverse and remand in part.

## STANDARD OF REVIEW

We review de novo the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *Zimmerman v. City of Oakland,* 255 F.3d 734, 737 (9th Cir.2001). All allegations of material fact in the complaint are regarded as true and construed in the light most favorable to Digital Images. *Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1101 (9th Cir.1999) (citations omitted). Digital Images' second amended complaint was not subject to dismissal unless it appeared beyond doubt that Digital Images could prove no set of facts in support of its claims that would entitle it to relief. *Morley v. Walker,* 175 F.3d 756, 759 (9th Cir.1999) (citations omitted).

We review de novo the district court's grant of summary judgment. *Balint v. Carson City, Nev.,* 180 F.3d 1047, 1050 (9th Cir.1999) (en banc). We view the evidence in the light most favorable to Digital Images, the nonmoving party, and determine whether any genuine issues of material facts exist and whether the district court correctly applied the relevant substantive law. *Id.*

"Antitrust standing is a question of law reviewed de novo." *American Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,* 190 F.3d 1051, 1054 (9th Cir.1999).

## BACKGROUND

Digital Images alleges that most filmed entertainment product in the United States was edited during the 1990's on "non-linear editing systems," a digital technology based method of efficiently accessing and rearranging film images and audio tracks. Until September 1998, two competing manufacturers of non-linear editing systems existed in the United States' film market, Tektronix and Avid, the defendants in this case. According to plaintiff Digital Images' complaint, Tektronix and Avid were "powerful rivals" who engaged in "fierce" economic and innovative competition from which Digital Images and other consumer-purchaser end users of their respective products materially

benefitted across the board. Tektronix called its system "Lightworks." Avid referred to its competing product by the company name, "Avid."

Digital Images was in the business of (1) leasing to film companies for their own use non-linear editing equipment which it purchased from the manufacturer, and (2) using these systems to perform professional editing services for customers in the film industry. Digital Images purchased its entire stock of non linear editing equipment, i.e., Lightworks, from Tektronix and relied on the manufacturer for service, features, upgrades, and support. In antitrust terms, Digital Images was in the "purchase market" a customer-consumer who obtained goods and related services in the relevant market from the defendants. As counsel argued to the court, Digital Images was, among other things, a "buyer for [its] own use." [ER 0263.] Digital Images alleges also that it competed with the manufacturers Avid and Tektronix in the rental market as a rental equipment and service provider ("RESP"). The point of competition alleged was the decision by limited-purpose film production companies either to buy a machine from the manufacturer, or rent one from a RESP. It is in these capacities that we examine its standing to bring this action.

At a series of meetings between April and October 1996, Tektronix representatives met with Lightworks' customers, including Digital Images. During these meetings, Tektronix representatives asserted that Tektronix would continue to improve and aggressively to market Lightworks. Between 1996 and August 1998, the representatives discussed Tektronix's forward-looking business plans during one-on-one meetings with Digital Images, and at industry conventions and trade shows. Based on Tektronix's presentations, Digital Images alleges it chose to remain with

Lightworks instead of switching to Tektronix's competitor, Avid.

By September 1998, Avid had succeeded in controlling 85% of the non-linear film editing machine market. On September 3, 1998, abruptly, without warning, and contrary to previous representations, Avid and Tektronix entered into an "alliance" whereby Tektronix agreed to cease manufacturing and selling its Lightworks system, and to become a distributor for its previous competitor Avid's non-linear film editing products. To quote Digital Images' second amended complaint,

> (b) Avid and Tektronix agreed "jointly" to market Avid's current and future non-linear editing products to the broadcast market, and *Tektronix was prohibited from selling the Avid non-linear editing product to film market RESPS [i.e., rental equipment and service providers,] (such as Digital Images).* When the parties agreed to end competition, which they recognized would be viewed as anti competitive conduct, they colluded to conceal the true facts from the public. This was done through a variety of maneuvers, including false S.E.C. filings concerning Lightworks, false statements at press conferences, and an incentive system under which Tektronix would effectively be precluded from competing with Avid—even though the "joint venture" agreements did not contain an express non-compete clause; and
> (c) Avid and Tektronix agreed to stop competing in markets for the sale of editing equipment to the broadcast industry, and instead to combine their products into a single product that would eliminate the non-linear news editing equipment markets—which set the stage for Avid and Tektronix to split the profits that would be realized from the elimination of competition in these markets. Further to that scheme, Avid and

Tektronix formed a jointly-owned corporation called "Avstar Systems LLC." The agreement between Tektronix and Avid was an egregious act of unlawful market division. . . .

[ER 0188–0189.] (Emphasis added.)

Digital Images alleges that this joint venture was purposefully anti-competitive and caused its film producer customers to refuse to have their films edited with Lightworks technology after they discovered that the system had been discontinued. Unable to switch products because of costs and allegedly insurmountable change-over complications, this competition-ending agreement between Avid and Tektronix effectively ruined Digital Images' Lightworks reliant business, and forced Digital Images out of business. As the district court noted, as a result of this joint venture "plaintiff's business was abruptly destroyed."

Notwithstanding a string of prior consistent representations to the industry to the contrary, on October 9, 1998, Tektronix claimed to the Security and Exchange Commission ("S.E.C.") in justification of its decision to collaborate with Avid that it had entered into the alliance because Lightworks was near the end of its product life cycle. Whatever the reason, the alliance allegedly had the effect of eliminating all competition in the relevant market wherein Digital Images was both a customer-purchaser-owner-end-user and a purchaser-owner-lessor. Digital Images asserts that the agreement gave Avid a monopoly in the relevant market. Inter-brand competition was dead.

Digital Images filed this private anti-trust lawsuit on March 10, 1999, alleging that the Avid/Tektronix agreement violated antitrust laws—the Sherman Act (15

U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. § 18), and the Cartwright Act (Cal. Bus. & Prof.Code § 16726). Digital Images alleged also state law claims against Tektronix for fraud, negligent misrepresentation, and promissory estoppel, and a claim against Avid for interference with prospective business advantage.

Digital Images alleged in its complaint that Tektronix's representations regarding its intentions were both material and false, and that Digital Images relied on these statements in two principal ways: (1) Digital Images repeated Tektronix's misrepresentations to its customers which caused it to lose business and credibility when the representations turned out to be false; and (2) Digital Images remained an exclusive Lightworks vendor (which included substantial capital investments in Lightworks equipment), which caused Digital Images to suffer unrecoverable losses when Tektronix failed to deliver on its representations and then suddenly, collusively, and unlawfully exited the non-linear editor business in September 1998.

On September 15, 1999, the district court dismissed Digital Images' first amended complaint with leave to amend. *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F.Supp.2d 1073, 1085–86 (C.D.Cal. 1999); *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F.Supp.2d 1086, 1101–02 (C.D.Cal.1999). Digital Images filed its second amended complaint on November 3, 1999, alleging the same claims as its first amended complaint and attempting to cure deficiencies identified by the district court. The district court dismissed the second amended complaint's claims of federal and state antitrust law violations against Avid and Tektronix after it concluded that Digital Images had failed to allege the necessary "antitrust injury."[1]

---

1. After this dismissal, the parties entered into a stipulation to dismiss with prejudice the

intentional interference claim against Avid, without prejudice to Digital Images' right to

The district court dismissed also, in part, Digital Images' fraud and negligent misrepresentation claims, and dismissed its promissory estoppel claim in its entirety. The court reasoned that most of the alleged misrepresentations were not actionable as fraud or negligent misrepresentation because they constituted mere puffery or were too vague. The court dismissed Digital Images' promissory estoppel claim because the alleged promises were too vague or indefinite, and because no allegations supported the conclusion that injustice could only be avoided by enforcing them. The district court concluded, however, that five alleged misrepresentations were facially actionable as fraud and negligent misrepresentation and not subject to 12(b)(6) dismissal.

On July 11, 2001, however, the district court granted summary judgment in favor of Tektronix on the basis of Digital Images' five remaining claims for fraud and negligent misrepresentation because Digital Images had "failed to present a disputed issue as to whether it justifiably relied on the alleged misstatements." The district court entered final judgment on August 10, 2001, and Digital Images timely appealed.

## DISCUSSION

### A.

#### Standing

Section 4 of the Clayton Act provides that "any person ... injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore...." 15 U.S.C. § 15(a). This law effectively allows private persons to sue for antitrust violations previously restricted by statute to government enforcement. Digital Images claims that the Avid/Tektronix agreement violated federal antitrust law, principally sections 1 and 2 of the Sherman Antitrust Act, by creating a monopoly, destroying competition in the relevant market, and restraining trade, all to the detriment of Digital Images' "business" and its "property." To quote its brief, "Digital Images was injured by ... the collusive restructuring of markets to the benefit of the colluders and to the detriment of other market participants including those who buy products ...."

Only those who meet the requirements for "antitrust *standing*" may pursue a claim under the Clayton Act; and to acquire "antitrust standing," a plaintiff must adequately allege and eventually prove "antitrust *injury.*" *American Ad*, 190 F.3d at 1054–55 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530–35, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (emphases added)).

Antitrust injury is defined not merely as injury caused by an antitrust violation, but more restrictively as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In *Brunswick*, for example, the Supreme Court held, as we explained in *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024 (9th Cir.2001), that "a plaintiff must prove that his loss flows from an *anticompetitive* aspect of the defendant's behavior.... If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's con-

appeal and reinstatement in the event of reversal. The intentional interference claim is not an issue in this appeal.

duct is illegal *per se.*" *Pool Water,* 258 F.3d at 1034 (citation and internal·quotation marks omitted). Applying this test the Supreme Court concluded in *Brunswick* that antitrust damages are not available "where the sole injury alleged is that [failing] competitors were continued in business [by the defendant's acquisition of them,] thereby denying[plaintiffs] an anticipated increase in market shares." 429 U.S. at 484, 97 S.Ct. 690. Similarly, the Court concluded in *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) that loss or damage to a competitor due merely to increased competition, such as a possible diminution of profits due to price competition following a merger by other competitors is not antitrust injury. The Court pointed out that the antitrust laws "were enacted for 'the protection of competition, not competitors.'" *Id.* at 115, 107 S.Ct. 484 (quoting *Brunswick,* 429 U.S. at 488, 97 S.Ct. 690; quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).

Antitrust injury is made up of four elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *American Ad,* 190 F.3d at 1055.

In addition, we impose a fifth requirement, that "the 'injured party be a participant in the same market as the alleged malefactors.'" *Id.* at 1057 (quoting *Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467, 1470 (9th Cir.1985)). "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Eagle v. Star–Kist Foods, Inc.,* 812 F.2d 538 (9th Cir.1987). In fact, and as the district court recognized, "Consumers in the mar-

ket where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *See SAS v. Puerto Rico Tel. Co.,* 48 F.3d 39, 44–45 (1st Cir. 1995) ("[t]he presumptively proper plaintiff is a customer who obtains services in the threatened market"); *See Associated Gen. Contractors v. Carpenters,* 459 U.S. at 538, 103 S.Ct. 897 ("As the legislative history shows, the Sherman Act was enacted to assure customers the benefits of price competition, and . . . [to] protect[ ] the economic freedom of participants in the relevant market.").

## B.

### The District Court's Analysis

The district court examined Digital Images' first amended complaint and determined in connection with defendants' Rule 12(b)(6) motion (1) that the defendants' conduct as alleged was "wrongful . . . under the antitrust laws," (2) that Digital Images' damage resulted from the defendants' conduct, (3) that the injury suffered by Digital Images flowed from that which made the defendants' conduct unlawful, and (4) that the discontinuation of the Lightworks product line had "a negative effect on competition." 100 F.Supp.2d 1073. The court said, "There is no question that plaintiff has alleged conduct that would violate the antitrust laws." *Id.* at 1080. The court correctly noted also that the antitrust laws

do not preclude any manufacturer from independently discontinuing a product line any more than they preclude a manufacturer from independently raising prices. . . . However, when a manufacturer discontinues a product in return for a benefit from a competitor, this conduct may violate the antitrust laws.

*Id.* at 1081. With respect to the second amended complaint, however, the district court concluded that Digital Images, which

it regarded primarily as a "displaced distributor," had failed to allege an "injury of the type the antitrust laws were intended to prevent...."[2] [ER 291.] *Brunswick* 429 U.S. at 488, 97 S.Ct. 690. The district court said,

> Granting relief to Plaintiff for a reduction in the value of its inventory as a result of a merger would, therefore, have the perverse effect of punishing mergers that lead to the production of better products in proportion to the superiority of the merged entity's products.

[ER 287.]

The court was influenced by Digital Images' failure to allege that it "intends to make or has made purchases in the newly-modeled market" as well as its failure to claim predatory pricing on the part of the allied defendants. The court concluded also that Digital Images' allegation that its inventory had become obsolete was "not an injury suffered in the new purchase market." Finally, the court opined that mergers that result in better products are pro-competitive and should not be rendered actionable under our antitrust laws.

Defendants argue not that their alliance was unlawful, but that antitrust injury is not present here because the same harm would have resulted if Tektronix had merely gone out of business. They rely on cases recognizing that "loss incurred because of an unlawful acquisition that would also have been incurred had the acquisition been lawful is not antitrust injury." *Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc.,* 140 F.3d 1228, 1233 (9th Cir.1998) (citing *Brunswick,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701); *Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours and Co.,* 826 F.2d 1235 (3rd Cir.1987). Defendants argue also that "[i]f the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se." Pool Water,* 258 F.3d at 1034 (quoting *Rebel Oil Co. v. ARCO,* 51 F.3d 1421, 1433 (9th Cir. 1995)).

## C.

## Type of Injury

The main argument on appeal involves *American Ad*'s fourth requirement: whether Digital Images' injury is "of the type the antitrust laws were intended to prevent." 190 F.3d at 1055. In this respect, the intentions of the antitrust laws are well synthesized in *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940):

> The end sought [by the Sherman Act's prohibition against unreasonable restraints of trade] was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices *or otherwise control the market to the detriment of purchasers or consumers of goods and services,* all of which had come to be regarded as a special form of public injury.

*Id.* at 493, 60 S.Ct. 982 (emphasis added). "[T]he central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition ... that these statutes recognize as vital to the public interest." *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 988 (9th Cir. 2000). "Every precedent in the field makes clear that the interaction of competitive forces ... is what will benefit consumers." *Id.*

**2.** The first and second amended complaint make consistent allegations regarding the antitrust injury suffered. The district court viewed Digital Images' allegations more favorably in its decision dismissing the first amended complaint.

The district court's first error was to characterize Digital Images role in the market as a "distributor," a role which Digital Images protests it did not play. Typically, a distributor is a wholesaler who sells products chiefly to retailers and commercial users, usually as part of a contractual relationship with the primary manufacturer of the product, or with a franchisor. Digital Images' complaint establishes no such relationship with either defendant. We agree with Digital Images that this focus was a mistake and that "terminated distributor" cases, such as *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir.1977), are unhelpful. Thus, the district court's conclusion that Digital Images had suffered no antitrust injury as a distributor was simply irrelevant.

Unfortunately, the district court's mistaken view that Digital Images was a distributor of Tektronix's products carried over into its analysis of Digital Images' allegation that it competed as a RESP in the rental market with the defendant manufacturers. The court dismissed this assertion on the ground that the rule that "canceled distributors do not have antitrust standing does not have an exception merely because the manufacturer is also a seller of the products to end-users that is also sold to end-users by the distributor." "Plaintiff's role in the market is really undistinguishable for [sic] its role as a 'distributor'."

As indicated, the court's decision fatally to pigeon hole Digital Images as a distributor is simply wrong. Digital Images disclaims any such relationship with Tektronix, and there is nothing sufficient in the pleadings to impeach this assertion. Thus, for standing purposes, Digital Images alleged enough to establish factually that it is both a customer and a competitor in a slightly different market.

The court's third error was to limit a purchaser/consumer's actionable antitrust injury to situations where the purchaser/consumer has made or intends to make purchases in the relevant market which, as the result of antitrust activity, now suffers from (1) artificially increased prices, or (2) artificially less innovative products. *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 100 F.Supp.2d 1073, 1080 (C.D.Cal. 1999). With all respect, this understanding of antitrust injury is too restrictive.[3]

The Avid/Tektronix agreement detrimentally changed the market make-up and limited consumers' choice to one source of output. One form of antitrust injury is "[c]oercive activity that prevents its victims from making free choices between market alternatives." *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir.1996) (internal quotation marks and citation omitted). The injury alleged flowed from the discontinuation of the only competing product on the market by agreement between the only two competitors in the market. Digital Images and its customers no longer had a viable choice between market alternatives.

---

3. The district court believed also that Digital Images' injury was "exacerbated by the very thing the antitrust laws are designed to promote" because its "current inventory of editing products is harmed the more innovative and productive the joint-venture between Avid and Tektronix." The district court went on to conclude that "[g]ranting relief to [Digital Images] for a reduction in the value of its inventory as a result of a merger would ... have

the perverse effect of punishing mergers that lead to the production of better products in proportion to the superiority of the merged entity's products." [ER 287.] This analysis is sheer speculation. Nothing in the record supports the proposition that the joint venture produced better products, innovation, or productivity. In fact, the complaint alleges that the effect of the agreement was to diminish innovation and quality of the product.

Defendants' reliance on cases where courts found no antitrust injury because the "harm" resulted from lower prices, continued competition, or increased competition simply do not apply to the instant case. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 336, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Brunswick*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701; *Cargill*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427. Nothing in the record indicates that the Avid/Tektronix agreement lowered prices or enhanced competition. Additionally, none of the cases relied on by the defendants involved the elimination of all competition similar to that alleged by Digital Images. Nothing in the record indicates that a finding of antitrust injury under the circumstances of this case would punish behavior that the antitrust laws are designed to promote.

*Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) provides us with assistance in deciding the dispositive issue in this case. Virginia McCready was a Blue Shield subscriber who sought the professional services of a psychologist for a mental and nervous disorder. Blue Shield refused to cover these services on the ground that the services had been provided not by a psychiatrist, but by a non-physician psychologist. McCready then sued Blue Shield and the Neuro–Psychiatric Society of Virginia, claiming an unlawful conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 "to exclude and boycott clinical psychologists from receiving compensation under the Blue Shield plans." *Id.* at 470, 102 S.Ct. 2540. The district court dismissed her lawsuit on the ground that she had no antitrust standing. A divided panel of the Fourth Circuit reversed. 649 F.2d 228 (1981). The dissenting judge saw McCready's injury not "as a design or good of any antitrust violation," but "rather as a consequence thereof."

The Supreme Court affirmed the Fourth Circuit, holding that McCready as a customer had standing to sue:

"As a consumer of psychotherapy services entitled to benefits under the Blue Shield Plan, we think it's clear that McCready was within that area of the economy ... endangered by [that] breakdown of competitive conditions."

457 U.S. at 480, 102 S.Ct. 2540 (internal quotation marks and citation omitted).

The Supreme Court dismissed as irrelevant the defendant's arguments, which are similar to the defendants' *Brunswick*-based arguments made here, (1) that McCready did not visit a psychiatrist whose fees were artificially inflated as a result of the competitive advantage he gained by the alleged conspiracy, (2) that McCready suffered no out-of-pocket additional expenses because of the conspiracy, and (3) that her psychologist's bills were no higher because of the conspiracy. The court said,

*Brunswick* is not so limiting. Indeed, as we made clear in a footnote to the relied-upon passage, a § 4 plaintiff need not "prove an actual lessening of competition in order to recover. [C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." *Id.*, at 489, n. 14, 97 S.Ct. at 698 n. 14. *Thus while an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 potentially offers redress,* see *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), *that is not the only form of injury remediable under § 4.* We think it plain that McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws.

*McCready charges Blue Shield with a purpose-fully anti-competitive scheme.* She seeks to recover as damages the sums lost to her as the consequence of Blue Shield's attempt to pursue that scheme. She alleges that Blue Shield sought to induce its subscribers into selecting psychiatrists over psychologists for the psychotherapeutic services they required, and that the heart of its scheme was the offer of a Hobson's choice to its subscribers. Those subscribers were compelled to choose between visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment by the practitioner of their choice. In the latter case, the antitrust injury would have been borne in the first instance by the competitors of the conspirators, and inevitably—though indirectly—by the customers of the competitors in the form of suppressed competition in the psychotherapy market; in the former case, as it happened, the injury was borne directly by the customers of the competitors. McCready did not yield to Blue Shield's coercive pressure, and bore Blue Shield's sanction in the form of an increase in the net cost of her psychologist's services. *Although McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market.* In light of the conspiracy here alleged we think that McCready's injury "flows from that which makes defendants' acts unlawful" within the meaning of *Brunswick,* and falls squarely within the area of congressional concern.

457 U.S. at 482–484, 102 S.Ct. 2540 (emphasis added) (internal footnotes omitted).

The parallels here to *McCready* are apparent. In each case, a customer was directly damaged by an act alleged to be in violation of the antitrust laws. The customer was not required to show that the reduced competition increased the basic market cost of the service involved, only that she was directly and economically hurt by the alleged violation.

*FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) supports our conclusions. In that case, dentists conspired to refuse to submit x-rays to insurers for use in evaluating claims for benefits. In sustaining the FTC's conclusion that this practice unreasonably and conspiratorially restrained trade in violation of § 1 of the Sherman Act, the Court said,

> The Federation's policy takes the form of a horizontal agreement among the participating dentists to withhold from their customers a particular service that they desire—the forwarding of xrays to insurance companies along with claims forms. "While this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them.

*Id.* at 459, 106 S.Ct. 2009.

Granted that this discussion was directed at whether the restraint in question was "unreasonable," but we note that the reason it was regarded as unreasonable is that it restricted customers' choices by purposefully eliminating something from

the market without any redeeming procompetitive effect. As the Court said, "The Federation is not entitled to preempt the working of the market by deciding for itself that its customers do not need that which they demand." *Id.* at 462, 106 S.Ct. 2009. *See also NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 110, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Thus [the NCAA's plan to restrict television broadcasts of football games] is inconsistent with the Sherman Act's command that price and supply be responsive to consumer preference."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 357b. (2d ed. 2000) ("Antitrust law addresses distribution restraints in order to protect consumers from the higher prices or diminished choices that can sometimes result from limiting intrabrand competition."); *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 815 F.2d 270, 275 (3d Cir. 1987) (citation omitted) ("[A]n agreement limiting consumer choice by impeding the 'ordinary give and take of the marketplace' . . . cannot be sustained under the Rule of Reason.")

The defendants rely in large measure on cases that are sufficiently distinguishable to be inapposite and unhelpful. This case at this stage is not *Brunswick*, it is not *Cargill*, it is not *Pool Water*, and it is not *Lucas Automotive*.[4] In the *Brunswick* line of cases, the alleged "injury" was simply a loss of greater profits caused by *increased* competition stemming from the alleged wrongful acts. Here, as the record now stands, there is *no* pro competitive aspect of the defendant's strategic alliance, none. Conduct, such as an agreement to restrain trade, "is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect." *Amarel*, 102 F.3d at 1509, (quoting *Associated Gen. Contractors v. Carpenters*, 459 U.S. at 528, 103 S.Ct. 897). Moreover, whatever might have happened to Digital Images, had some other event occurred resulting in the demise of Lightworks, is irrelevant in this context. The strategic alliance set out to exterminate Lightworks and allegedly succeeded, leaving only one product, no choices, and no competition in its wake. Furthermore, this case is not strictly a merger case, or a case involving the simple discontinuation of a product line, or one involving the termination of a distributor. To repeat, it is a case where the plaintiff has alleged an unlawful agreement, dressed up as a competitor collaboration, to kill off a product in order to end competition, and a case where the plaintiffs' business which used that product was directly and intentionally strangled in the consummation of that agreement. Digital Images suggests that the agreement prohibited Tektronix from selling the only remaining product to it as a RESP. In this connection, and to borrow from *McCready*, the injury and the damage suffered by Digital Images to its property and business was "inextricably intertwined" with an agreement by two separate manufacturers which the district

---

4. Nor is it (1) *Hairston v. Pacific 10 Conference*, 101 F.3d 1315 (9th Cir.1996) (where antitrust standing was questionable and where the plaintiffs failed to "offer even the thinnest reed of support to meet their burden of proof that the defendants procompetitive objectives could be achieved in a substantially less restrictive manner"); (2) *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139 (9th Cir.1989) (en banc) where there was no agreement to restrict the output of the product "in the market" and no anticompetitive effect demonstrated with respect to the alleged restraint; or (3) *ARCO v. U.S.A. Petroleum*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (one competitor held not to have demonstrated antitrust injury from rival's vertical, maximum price fixing agreement).

court recognized as clearly in violation of the Sherman Act.

Digital Images' allegation of "loss stems from a competition-reducing aspect or effect of [defendants'] behavior," *Atlantic Richfield*, 495 U.S. at 344, 110 S.Ct. 1884. Given that customers are the intended beneficiaries of competition, and that customers are presumptively those injured by its unlawful elimination, for pleading purposes we conclude that Digital Images has satisfied the requirement that it adequately allege antitrust injury to its business.[5] In its pleadings, Digital Images presents an allegation of "injury-in-fact that was reasonably proximate to the violation without undue duplication, complex apportionment, or alternative plaintiffs more directly affected by the violation." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 335d. (2d ed. 2000).

If the antitrust laws are designed to protect customers from the harm of unlawfully elevated prices, and from "agreements between competitors at the same level of the market structure to allocate territories in order to minimize competition," *United States v. Topco Assocs.*, 405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), it is no stretch to conclude that these same laws protect customers from harm directly related to the unlawful removal of a competitive product from the market. If as *McCready* (quoting *Brunswick*) suggests, "competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened," *McCready*, 457 U.S. at 482–484, 102 S.Ct. 2540, one would think that a customer in business directly driven from the market by an agreement in restraint of trade would be able to do the same. It is one thing for a business to have cast its fate with a product that disappears because of the normal forces of the market; it is another to have the rug pulled out from under a business by a conspiratorial agreement to eliminate a competing product from the process upon which our economic model depends in order to promote social welfare. As the Supreme Court has said,

> Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise systems as the Bill of Rights is to the protection of our fundamental personal freedoms.

*Topco Associates*, 405 U.S. at 608, 92 S.Ct. 1126.

---

**5.** Defendants argue that "by 1998 the demand for Lightworks' products had declined drastically." This decline in demand may make it more difficult for Digital Images to prove damages in a certain amount or to demonstrate the "direct" or causation element for antitrust standing, but it does not impact our finding of antitrust injury. Moreover, the defendants muddy the Rule 12(b)(6) waters by injecting assertions of factual disputes into their argument, such as (1) Lightworks was not discontinued but "sold to a third party and is in business," and that Digital Images knew it, and (2) "Ms. Shott [the owner of Digital Images], shutdown her own company and went off to write a novel." Whether this is true or not, and whether it is relevant is to be decided at a stage later through a motion to dismiss for lack of standing pursuant to Rule (12)(b)(6). It is true of course, that an antitrust cause of action is susceptible of dismissal at any stage once it does appear factually that the injury complained of was not antitrust in nature. As illustrated in *Brunswick*, "judgment must be given to the defendant whenever it appears that any essential element of the plaintiff's claim is missing...." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 335e2. (2d ed. 2000); *R.C. Dick Geothermal*, 890 F.2d at 145 (standing is properly raised at any stage of the litigation). Finally, we do not address the validity of defenses such as "failing business," "exiting assets," and "failing division." *See Antitrust Law Developments* (Fifth), Appendix C § 5.

## D.

### Fraud and Negligent Misrepresentation Claims

Under California law, both fraud and negligent misrepresentation as causes of action require Digital Images to demonstrate it justifiably relied on Tektronix's misrepresentations. *Anderson v. Deloitte & Touche LLP*, 56 Cal.App.4th 1468, 66 Cal.Rptr.2d 512, 515 (1997) (fraud); *Fox v. Pollack*, 181 Cal.App.3d 954, 226 Cal.Rptr. 532, 537 (1986) (negligent misrepresentation). Digital Images bases its fraud and negligent misrepresentation claims on eight statements:

(1) In early 1996, Tektronix personnel advised Digital Images and others that "Version 6.0" software was "in the late stages of beta testing" and would be released within a few months;

(2) In early 1996, Tektronix personnel declared that "Version 6.0 is being treated as a high priority at Lightworks and we have more than enough engineers and programmers to meet our goals";

(3) In early 1996, Tektronix offered assurances that it placed a "high priority" on system upgrades, and that it intended to allocate all necessary resources to ensure improvement of the Lightworks system;

(4) In early 1996, Tektronix executives told Digital Images that a "24–frame development is being done on a priority basis and involves only a simple modification of the 30–frame system— which is almost complete";

(5) In early 1996, Tektronix advised that it had "people actively developing a real-time effects system, and will unveil it next year";

(6) In early 1996, Tektronix assured Digital Images and others that it was going to develop a more aggressive marketing campaign to advertise the Lightworks film editing system;

(7) In March 1998, Tektronix advised Digital Images that 24–frame software for the V.I.P. editing system would be delivered no later than September 1, 1998, but rescinded that assurance approximately one month later, and instead advised Digital Images that it would not be developing such software; and

(8) In March 1998, Tektronix issued a press release that particularly described Version 6.0 features. The press release stated: "Tektronix is committed to the Lightworks editing line, illustrated by new software releases. The upcoming release of Version 6.0 software brings dramatic new features to Lightworks Turbo and Heavyworks systems, including 5 min/GB picture resolution for the Heavy-works product. . . . "

The district court dismissed the second, third, and sixth statements under Federal Rule of Civil Procedure 12(b)(6). We agree with the district court that these statements—generally describing the "high priority" Tektronix placed on product development and alluding to marketing efforts—do not state an actionable fraud or negligent misrepresentation claim. The statements were generalized, vague and unspecific assertions, constituting mere "puffery" upon which a reasonable consumer could not rely. *See Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246 (9th Cir.1990); *In re All Terrain Vehicle Litig.*, 771 F.Supp. 1057, 1060–61 (C.D.Cal.1991), *modified on other grounds*, 978 F.2d 1265 and 979 F.2d 755 (9th Cir.1992). Thus, the district court appropriately dismissed these claims.

The district court disposed of the remaining fraud and negligent misrepresentation claims by granting Tektronix summary judgment. The district court found

no evidence in the record supporting Digital Images' claim of justifiable reliance. We conclude that the district court appropriately granted summary judgment dismissing Digital Images' fraud and negligent misrepresentation claims based on the fourth, seventh, and eighth statements. Digital Images did not demonstrate justifiable reliance on these statements. The fourth statement concerning development of a 24-frame system in 1996 could not support justifiable reliance because Digital Images expressed no serious interest in purchasing this system until April of 1998. By then, Digital Images had already decided to stay with Lightworks. The seventh and eighth statements, made in 1998, could not support justifiable reliance because Digital Images had already decided by the Summer of 1997 to stay with Tektronix.

The district court erred, however, when it concluded that no genuine issues of material fact existed with regard to the first statement describing development of the Version 6.0 software. During 1996, Digital Images was weighing business options and deciding whether to switch to Avid or remain with Tektronix's Lightworks. Cary Shott, president of Digital Images, stated she relied on the information provided by Tektronix "while forming Digital Images' business plan." Shott asserted that "Tektronix'[s] promises and assurances . . . are what convinced [her] that [she] had a viable future as a Lightworks vendor." Shott also attested that, had Digital Images switched to Avid's editing system before mid–1997, its future profits would have been comparable to those it enjoyed using Lightworks and it "would have been able to fully amortize the cost of four new systems during the projects and would have been able to be more price competitive as the market continued to consolidate throughout 1997."

The district court concluded that Tektronix's statement affirming issuance of Version 6.0 was not actionable because it was true—a Version 6.0 was ultimately issued. However, this did not occur until 1998, and there is some question whether the system worked as promised. Nevertheless, the relevant time frame affecting Shott's decision to stay with Lightworks or transition to Avid was 1996. The fact that Version 6.0 was ultimately issued in 1998 does not address the impact Tektronix's representation had on Shott in 1996 when Tektronix promised delivery in a "couple of months."

As an alternate basis for dismissal, the district court concluded that "there is simply no support in the record for Digital Images' assertion that it only stayed with Lightworks because of the promised release of Version 6.0 software." The district court observed that Shott had offered other reasons for her decision to remain with Lightworks in 1997. Those other reasons, however, only explained her decision to stay with Lightworks in 1997 and not her decision to stay with Lightworks in 1996. In addition, Shott's other reasons for remaining with Lightworks would not defeat her claim as a matter of law. "[A]lleged fraud need not be the sole cause of a party's reliance. Instead, reliance may be established on the basis of circumstantial evidence showing the alleged fraudulent misrepresentation . . . *substantially influenced* the party's choice, even though other influences may have operated as well." *Sangster v. Paetkau*, 68 Cal.App.4th 151, 80 Cal.Rptr.2d 66, 78 (1998) (emphasis in original) (citations omitted).

Construing all facts and inferences in Digital Images' favor, a genuine issue of material fact exists concerning whether Tektronix's representation that Version 6.0 would be released in a "couple of months" substantially influenced Digital Images'

decision to remain with Lightworks in 1996 instead of switching to Avid's product. Accordingly, summary judgment should not have been granted on this issue and we remand.[6]

## E.

### Digital Images' Promissory Estoppel Claim

Digital Images argues that the eight statements underlying its fraud and negligent misrepresentation claims also support a promissory estoppel claim. Under California law, " '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " *Kajima/Ray Wilson v. Los Angeles County Metro. Transp. Auth.*, 23 Cal.4th 305, 96 Cal.Rptr.2d 747, 1 P.3d 63, 66 (2000) (quoting Restatement (Second) of Contracts § 90).

The district court dismissed Digital Images' promissory estoppel claim under Federal Rule of Civil Procedure 12(b)(6), concluding that the alleged representations did not constitute actionable promises because they were too vague or indefinite. "[A] promise that is 'vague, general or of indeterminate application' is not enforceable." *Aguilar v. Int'l Longshoremen's Union Local # 10*, 966 F.2d 443, 446 (9th Cir.1992) (quoting *Hass v. Darigold Dairy Prods. Co.*, 751 F.2d 1096, 1100 (9th Cir. 1985)). Additionally, "a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined

to provide a rational basis for the assessment of damages." *Ladas v. Cal. State Auto. Ass'n*, 19 Cal.App.4th 761, 23 Cal. Rptr.2d 810, 814–15 (1993) (citations omitted).

We agree with the district court that Tektronix's representations were not definite enough to be enforceable and that "Digital Images has not sufficiently alleged facts that would support the conclusion that injustice can only be avoided by enforcing the promise allegedly made by Tektronix." Digital Images has adequate remedies through its viable fraud and negligent misrepresentation claims; therefore, a promissory estoppel claim is not necessary to avoid injustice. *See Gibson v. Resolution Trust Corp.*, 51 F.3d 1016, 1026 (11th Cir.1995) (precluding promissory estoppel claim where alternate state law indemnification remedies offered adequate relief). The district court appropriately dismissed Digital Images' promissory estoppel claim, and we affirm.

### Request for Reassignment

Digital Images argues also that we should reassign this case to another district judge on remand. Absent personal bias, "reassignment is appropriate only in 'unusual circumstances.' " *American Ad*, 190 F.3d at 1061 (citations omitted). Such unusual circumstances rarely exist and do not exist in this case. *See California v. Montrose Chem. Corp.*, 104 F.3d 1507, 1521–22 (9th Cir.1997). Relevant considerations include "(1) whether [the district judge would] have substantial difficulty in putting out of his or her mind previously-expressed views ..., (2) whether reassignment is advisable to preserve the appear-

---

**6.** The district court identified the fifth statement (Tektronix's representation that it had "people actively developing a real-time effects system, and will unveil it next year [1997]"), as actionable and not subject to dismissal under Fed.R.Civ.P. 12(b)(6), but did not address the statement during subsequent summary judgment proceedings. It should do so on remand.

ance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* at 1521.

Here, Digital Images contends reassignment is necessary because the district judge called Cary Shott to the witness stand during the summary judgment proceeding and allegedly treated her rudely. The record, however, reflects that the district judge merely focused Shott's attention on the particular question he wanted her to answer. When Shott's brief testimony concluded, the judge thanked her. This short exchange does not create unusual circumstances warranting reassignment.

In addition, Digital Images argues that the district judge's off-the-cuff suggestion that he would not hire any other law clerks from Yale disparaged the law clerk's work in this case. For whatever purpose the district court intended this remark, it does not demonstrate the judge is biased against a party or otherwise unfit to preside over proceedings on remand. Additionally, the district court's alleged mismanagement of the docket does not rise to the level of an unusual circumstance.

Digital Images made no effort to tie its arguments to relevant precedent or explain how anything the district judge did or failed to do establishes bias or satisfies the *Montrose* factors. The existing record reveals no basis for reassigning the case to another district court judge on remand. Accordingly, Digital Images' request is denied.

## CONCLUSION

The district court's dismissal of Digital Images' state and federal antitrust claims alleged in the second amended complaint is reversed and we remand with instructions to reinstate those claims. The district court's dismissal of Digital Images' allegations of promissory estoppel, fraud and negligent misrepresentation in the second amended complaint is affirmed. The district court's order granting Tektronix summary judgment is reversed with regard to the fraud and negligent misrepresentation claims based on Tektronix's "Version 6.0" statement, but is affirmed in all other respects.

**AFFIRMED in part, REVERSED in part, and REMANDED.** The parties shall bear their own costs of this appeal.