## In re AMGEN INC. SECURITIES LITIGATION.

Mendell

v.

Amgen, Inc. et al.

Jaffe

v.

Amgen, Inc. et al.

Elden

v.

Amgen Inc. et al.

Rosenfield

v.

Amgen Inc. et al.

Public Employees' Retirement Association of Colorado

v.

Amgen Inc. et al.

Case Nos. CV 07–2536 PSG (PLAx), CV 07–2849 PSG (PLAx), CV 07–2865 PSG (PLAx), CV 07–3145 PSG (PLAx), CV 07–3320 PSG (PLAx), CV 07–3950 PSG (PLAx).

United States District Court, C.D. California.

Feb. 1, 2008.

Marc M. Seltzer, Ryan C. Kirkpatrick, Susman Godfrey, Michael F. Ghozland, Coughlin Stoia Geller Rudman and Robbins LLP, Mark I. Labaton, Kreindler and Kreindler, Timothy J. Burke, Stull Stull

and Brody, Lori S. Brody, Kaplan Fox and Kilsheimer, Los Angeles, CA, Matthew P. Montgomery, Barrack Rodos & Bacine, Michael J. Dowd, Coughlin Stoia Geller Rudman and Robbins LLP, San Diego, CA, Karen Hanson Riebel, Richard A. Lockridge, Lockridge Grindal Nauen, Minneapolis, MN, Joseph J. Tabacco, Jr., Nicole Lavallee, Berman Devalerio Pease Tabacco Burt & Pucillo, Laurence D. King, Kaplan Fox and Kilsheimer, San Francisco, CA, Barbara J. Hart, Christopher J. Keller, Christopher J. McDonald, Jesse Strauss, Jonathan M. Plasse, Louis Gottlieb, Mark Arisohn, Labaton Sucharow & Rudoff, LLP, Jules Brody, Stull Stull & Brody, Jeffrey P. Campisi, Joel B. Strauss, Kaplan Fox and Kilsheimer, New York, NY, D. Seamus Kaskela, Richard A. Maniskas, Schiffrin Barroway Topaz and Kessler LLP, Radnor, PA, Arthur Stock, Barbara A. Podell, Glen Abramson, Sherrie R. Savett, Berger & Montague, Philadelphia, PA, Evan Jason Smith, Brodsky and Smith LLC, Beverly Hills, CA, Steven S. Wang, Newmeyer & Dillion LLP, Newport Beach, CA, Jayne A. Goldstein, Mager and Goldstein, Weston, FL, for Scott Kairalla, City of Boca Raton Police & Firefighters Retirement System, Melanie Mendell, Gary Jaffe, John A. Elden, Burt Rosenfeld, Connecticut Retirement Plans and Trust Funds, Public Employees Retirement Association of Colorado.

Christopher Paul Murphy, John Nadolenco, Mack Anderson, Lisa W. Cornehl, Steven O. Kramer, Mayer Brown LLP, Los Angeles, CA, Darren J. Robbins, Susan G. Taylor, Coughlin Stoia Geller Rudman and Robbins LLP, San Diego, CA, for Amgen Inc., Kevin W. Sharer, Willard H. Dere, Richard D. Nanula, Dennis M. Fenton, Roger M. Perlmutter, Brian M. McNamee, George J. Morrow, Edward V. Fritzky, Gilbert S. Omenn, Franklin P. Johnson, Jr., London Pensions Fund Authority.

Ramzi Abadou, Coughlin Stoia Geller Rudman and Robbins LLP, San Diego, CA.

**Proceedings: (In Chambers) Order GRANTING in part and DENYING in part Defendant's Motion to Dismiss the Consolidated Amended Complaint**

PHILIP S. GUTIERREZ, District Judge.

In this class action for securities fraud, Plaintiffs allege that Defendants engaged in a scheme to deceive the investing public about the true value of Amgen stock. Defendants move to dismiss Plaintiffs' Consolidated Amended Complaint for failure to state a claim. A hearing on the motion was held on January 28, 2008. Having considered the papers filed by the parties and oral argument on the motion, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss.

I. *FACTS*

A. *Parties*

Plaintiffs, including Lead Plaintiff Connecticut Retirement Plans and Trust Funds (collectively "Plaintiffs"), are members of a class of shareholders who purchased stock in Defendant Amgen, Inc. ("Amgen") at an allegedly inflated price between April 22, 2004 and May 10, 2007 ("Class Period"). Defendant Amgen is a publicly traded company and the largest biotechnology company in the world. (CAC, ¶ 43.) During the time period relevant to this case, the individual defendants Kevin Sharer, Richard Nanula, Dennis Fenton, Roger Perlmutter, Brian McNamee, George Morrow, Edward Fritzky, Gilbert Omenn, and Franklin Johnson, Jr. (collectively "Individual Defendants") were all officers and directors of Amgen.

B. *Background*

This action arises out of Amgen's commercialization of two drugs—epoetin alfa, which Amgen markets in the U.S. as Epogen, and darbepoetin alfa, which Amgen markets in the U.S. as Aranesp. Both of these drugs are referred to as erythropoietin-stimulating agents, or ESAs, because they stimulate the formation of red blood cells.

### 1. FDA Approvals

In 1989, the Food and Drug Administration ("FDA") approved Epogen for the treatment of anemia associated with chronic renal failure, including end stage renal disease patients and patients with dialysis. (CAC, ¶ 37.) Later, the FDA approved the drug for persons who develop anemia as a consequence of chemotherapy for cancer, treatment of HIV infections with the pharmaceutical zidovudine, chronic kidney disease in pre-dialysis patients and anemic patients scheduled to undergo elective, non-cardiac, non-vascular surgery. (CAC, ¶ 38.) In 2001, the FDA approved Aranesp for the treatment of anemia associated with chronic renal failure, including patients on dialysis and those not on dialysis. (CAC, ¶ 42.) In 2002, Amgen secured FDA approval to market Aranesp for the treatment of anemia associated with cancer chemotherapy. (Id.)

### 2. Clinical Trials

In the late 1990's and early 2000's, there were several larger-scale clinical tests performed on ESAs, including the Normal Hemocrit Study, ENHANCE and BEST. (CAC, ¶ 33.) The Normal Hemocrit Study was a controlled study on patients with established heart disease. (CAC, ¶ 54.) The data safety monitoring board stopped the study because of a higher rate of blood clotting in patients randomized to the normal-level group. (Id.) Patients in that group also had a higher, but not statistically significant higher, rate of nonfatal heart attack and death. (Id.) The ENHANCE and BEST trials studied ESAs marketed in Europe but not approved by the FDA for use in the U.S. (CAC, ¶ 56.) The ENHANCE trial, which assessed the effect of an epoetin beta product—Neorecormon—on patients with head and neck cancer, resulted in "substantially shorter progression-free survival and overall survival than the placebo group." (CAC, ¶ 55.) The BEST trial, administered to breast cancer patients, was stopped after four months due to increased mortality in patients receiving an epoetin alfa product called Eprex. (Id.)

### 3. The 2004 ODAC Meeting

In light of the safety signals raised by the ENHANCE and BEST trials, the FDA convened a meeting in May of 2004 with the Oncology Drug Advisory Committee ("ODAC"), a group of leading experts in the field of oncology, to look into the safety of Aranesp and other ESAs. (CAC, ¶ 58.) In the weeks leading to the ODAC meeting, on April 22, 2004, Amgen, via Defendants Sharer, Nanula and Morrow,[1] held a conference call with analysts to discuss its earnings for the first quarter of 2004. (CAC, ¶ 59). When asked about the upcoming FDA meeting, Morrow allegedly "downplayed the significance of the meeting and the safety concerns of the FDA." (Id.) Morrow told analysts that Amgen "had decided to participate in that meeting 'cause the focus was not on Aranesp ... [and] there is no signal associated with Aranesp. We've had two perspective ran-

---

1. Defendant Sharer was, at all relevant times, Amgen's Chief Executive Officer and Chairman of the Board of Directors. (CAC, ¶ 14.) Defendant Nanula was Amgen's Chief Financial Officer from the beginning of the Class

Period until his resignation on April 10, 2007. (CAC, ¶ 15.) Defendant Morrow was, at all relevant times, Amgen's Executive Vice President of Global Commercial Operations. (CAC, ¶ 19.)

domized placebo controlled trials. And the safety for Aranesp has been comparable to placebo." (Id.)

During the meeting, the FDA communicated to Amgen that in order to resolve the ESA safety issue, Amgen should conduct clinical trials meeting a number of pre-specified criteria. (CAC, ¶ 61). Amgen also made a presentation outlining the "Amgen Pharmacovigilance Program," five planned or ongoing clinical trials involving Aranesp in different tumor treatment settings. One of these trials, sponsored by the Danish Head and Neck Cancer Group ("DAHANCA"), tested high doses of Aranesp in subjects with head and neck cancer. (CAC, ¶¶ 62, 67.) David Parkinson, M.D., Amgen's Vice President, Oncology Clinical Development, described the Amgen Pharmacovigilance Program as a "responsible and credible approach to definitively resolving the questions raised[d] in this morning's meeting." (CAC, ¶ 63.)

### 4. The DAHANCA 10 Trial

The DAHANCA 10 Trial tested whether high doses of Aranesp could aid in shrinking tumors of in patients with head and neck cancer receiving radiation therapy. (CAC, ¶ 64.) On October 18, 2006, DAHANCA investigators temporarily halted the study "due to information about potential unexpected negative effects related to immunohistochemical estimation of the so-called EPO receptor." (Id.) Pursuant to the DAHANCA 10 protocol, Amgen was informed of this development on or near October 18, 2006. (Id.)

On December 1, 2006, DAHANCA investigators terminated the study entirely. (CAC, ¶ 65.) According to the DAHANCA Interim Analysis, "there is a small but significant poor outcome in the patients treated with Aranesp" in that the tumor growth was worse for patients who took Aranesp than for those who did not. (Id.)

On February 16, 2007, *The Cancer Letter*, under the banner "Amgen Didn't Tell Wall Street About Results of Danish Study," reported that the DAHANCA trial had been halted in October 2006 because it showed "significantly inferior therapeutic outcome from adding Aranesp to radiation treatment of patients with head and neck cancer." (CAC, ¶ 66.) That same day, Amgen's stock dropped 2.3% to $66.73 per share. (CAC, ¶ 68.) On February 28, 2007, Amgen announced that it had received an inquiry from the SEC's Atlanta District Office regarding the DAHANCA 10 Trial. (Id.) The following day, on March 1, 2007, Amgen stock fell from $64.26 per share to $61.70 per share. (Id.)

### 5. CHOIR and CREATE Clinical Trials

On November 20, 2006, Amgen posted a statement entitled "Amgen responds to the CHOIR and CREATE Clinical Trial Data" on the Featured Content page of its website. (CAC, ¶ 74.) The CHOIR clinical trial tested whether anemia correction to 13.5 g/L with epoetin alfa would decrease mortality and cardiovascular morbidity in patients with chronic kidney disease. (Id.) The CHOIR data safety monitoring board terminated the study early due to findings on an increased death and cardiovascular hospitalization in these patients. (Id.) In the CREATE clinical trial, patients with chronic kidney disease and mild to moderate anemia were randomized to treatment with epoetin beta to either a high or low target hemoglobin. (Id.) On November 16, 2006, Roche Pharmaceuticals announced that the CREATE results "clearly show that there is no additional cardiovascular benefit from treating to higher hemoglobin levels in this patient group." (Id.)

Amgen's November 20, 2006 posting stated that "[a] very substantial body of evidence, developed over the past 17 years, demonstrates that anemia associated with chronic kidney disease can be treated safely and effectively with EPOGEN and Aranesp when administered according to the

Food and Drug Administration (FDA)-approved dosing guidelines. In particular, the FDA-approved labels for both drugs define regimens aimed at achieving a hemoglobin target not to exceed 12g/dL." (CAC, ¶ 75.)

### 6. *The 103 Study*

On January 25, 2007, Amgen held a conference call to discuss its fourth quarter 2006 earnings. (CAC, ¶ 69.) During the call, Amgen announced the results its clinical trial, the 103 Study, which tested Aranesp in 939 patients with anemia of cancer. (Id.) The FDA described the 103 study as "demonstrat[ing] significantly shorter survival rate in cancer patients receiving ESAs as compared to this receiving transfusion support. (CAC, ¶ 70.) In describing the results of the study on the conference call, Defendant Perlmutter, Amgen's Executive Vice President of Research and Development, stated:

> [W]e did not see a statistically significant adverse affect of Aranesp on overall mortality in this patient population, and so we conclude that the risk benefit ratio for Aranesp in these extremely ill patients with anemia secondary to malignancy is, at best, neutral and perhaps negative.

(CAC, ¶ 70.)

### 7. *Further Allegations of Fraudulent Statements*

On quarterly earnings calls held on July 24, 2002 and October 23, 2002, Defendant Morrow referred to various studies as "continu[ing] to validate the strong safety profile of Aranesp." (CAC, ¶ 72.) On an earnings call on January 22, 2004, Defendant Perlmutter stated, "[w]e find no evidence of adverse effects of Aranesp treatment on the survival of the cancer patient." (CAC, ¶ 73.) In February 2007,

Defendant Sharer told analysts, "We strongly believe, as we have consistently stated, that Aranesp and Epogen are safe and effective medicines with used in accordance with label indications." (CAC, ¶ 79.)

### 8. *Off–Label Marketing Scheme*

At the same time the FDA was questioning whether ESAs were safe for approved indications and populations, Amgen allegedly developed a sophisticated and multifaceted scheme to improperly push the ESAs for unapproved indications and populations.[2] (CAC, ¶¶ 81, 84.) This scheme included, among other things: (1) training Amgen sales representatives to prompt doctors to ask questions that would permit them to begin the off-label dialog regarding Aranesp and Epogen (CAC, ¶ 85); (2) creating a "speakers program" to boost off-label sales, wherein Amgen hired "expert" speakers to talk about off-label uses of Aranesp to physicians and other medical service providers, who received a $1,000 honorarium "paid from marketing budget" upon Amgen's receipt of their program evaluations (CAC, ¶ 89); (3) soliciting business by marketing increased drug dosages, such as encouraging doctors to inject Epogen intravenously rather than subcutaneously, which requires a smaller dose to achieve the same therapeutic effect (CAC, ¶¶ 92–93); (4) marketing Epogen and Aranesp to physicians and other medical service providers, by explicitly discussing the financial benefits of prescribing high volumes of these drugs, in violation of Medicare regulations (CAC, ¶ 100); and (5) providing spreadsheets and other tools to enable sales representatives to calculate "margin and spread," *i.e.* the profit that a medical prac-

---

**2.** The FDA does not prohibit physicians from prescribing drugs for unapproved, off-label uses. However, drug companies may provide information regarding off-label uses *only* in response to physician inquiries.

tice could earn by using particular Amgen drugs in combination. (CAC, ¶ 101.)

On December 4, 2006, Amgen issued a press release stating that "Amgen only promotes the use of Epogen and Aranesp consistent with the FDA label." (CAC, ¶ 103.)

### 9. Continued Press Regarding ESAs

On February 23, 2007, the *Associated Press* announced that the USP DI, an influential drug reference guide, had delisted Aranesp as a treatment for anemia in cancer patients not undergoing chemotherapy. (CAC, ¶ 104.) The article noted that delisting might prompt insurers to drop or reduce coverage for that use. (Id.) A few days later, in an article entitled "Studies Show Anemia Drugs May Harm Cancer Patients," the *New York Times* reported that the drugs used to treat anemia caused by chemotherapy might make the cancer worse. (CAC, ¶ 105.) On March 9, 2007, the FDA announced it would include a black box warning for all ESAs, including Aranesp and Epogen. (CAC, ¶ 108.) The public health advisory read:

> Recently completed studies describe an increased risk of death, blood clots, strokes, and heart attacks in patients with kidney failure where ESAs were given at higher than recommended doses. In other studies, more rapid tumor growth occurred in patients with head and neck cancer who received these higher doses.
>
> In studies where ESAs were given at recommended doses, an increased risk of death was reported in patients with cancer who were not receiving chemotherapy and an increased risk of blood clots was observed in patients following orthopedic surgery.

(Id.)

Immediately following the FDA press release, Amgen's share price declined 2.1 % to $60.86 per share. (CAC, ¶ 109.) On March 10, 2007, the *New York Times* re-

ported that the day after the FDA's public health advisory, the American society of Clinical Oncology sent a note to its members saying it had learned that Medicare was cutting off reimbursement for all forms of erythropoietin. (CAC, ¶ 109.) The same article reported that an FDA official stated "that the manufacturer had never demonstrated the use of [Epogen and Aranesp] actually improved energy levels or quality of life for patients undergoing chemotherapy." (Id.) Several other article ensued, and on May 8, 2007, the FDA posted an analysis of Aranesp and Epogen on its website, noting that the drugs "were clearly demonstrated to be unacceptable" in high doses. (CAC, ¶ 118.) On May 9, 2007, the *New York Times* published an article entitled "Doctors Reap Millions for Anemia Drugs," detailing Amgen's practice of paying "rebates" to doctors in proportion to the prescribed amount of Epogen and Aranesp. (CAC, ¶ 119.)

### 10. 2007 ODAC Meeting

On May 10, 2007, ODAC met again to discuss the status of the ESAs. (CAC, ¶ 120.) After considering testimony from the FDA and ESA marketers, ODAC voted to restrict the use of ESAs, to expand the existing warnings, and to require ESA manufacturers to conduct further studies to support the drugs' current indications. (CAC, ¶ 120, 125.) The FDA also concluded that Amgen had misstated the results of two studies submitted to the FDA. (CAC, ¶ 126.) In Study 161, Amgen had stated that the safety profile of Aranesp treated patients was comparable to that of the placebo treated group. (Id.) However, the FDA found there was shorter overall survival and higher incidence of blood clotting in Aranesp-treated patients. (Id.) In Study 145, Amgen reported that no difference in overall survival was observed. (Id.) The FDA found that failure to dem-

onstrate overall survival improvement with Aranesp did not exclude the possibility that Aranesp had decreased survival. (Id.) That same day, Amgen share price fell from $63.10 to $57.33 per share. (CAC, ¶ 127.)

### C. Consolidated Amended Complaint

On October 1, 2007, Plaintiffs filed a Consolidated Amended Class Action Complaint for Violation of Federal Securities Laws ("CAC"). The CAC alleges two causes of action: (1) violation of § 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 against all Defendants; and (2) violation of § 20 of the Exchange Act against all Defendants. The gravamen of Plaintiffs' complaint is that Defendants made materially false and misleading statements regarding the safety of ESAs, engaged in extensive unlawful marketing of its ESA, and as a result, artificially inflated the price of Amgen's stock during the Class Period.

Defendants now move to dismiss Plaintiff's CAC for failure to state a claim.

## II. PLEADING STANDARDS

### A. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of facts consistent with those allegations. *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007); *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1990) (stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory). Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief. *Bell Atlantic*, 127 S.Ct. at 1968 (*abrogating Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir.2006); *Balistreri*, 901 F.2d at 699. Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (*citing Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir.1996)); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.2000).

### B. Federal Securities Fraud: PSLRA

Through the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress has imposed heightened pleading standards on federal securities fraud actions 15 U.S.C. §§ 78u–4(b)(1), (2). "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001)). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" *Id.* at 1084–85 (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 (9th Cir.1999)). To meet the PSLRA standards, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on in-

formation and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* at 1085 (citing 15 U.S.C. §§ 78u–4(b)(1)).

With respect to pleading scienter, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The PSLRA does not define what constitutes a "strong inference". However, in the recent decision, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* — U.S. ——, 127 S.Ct. 2499, 2502, 168 L.Ed.2d 179 (2007) (hereinafter referred to as "*Tellabs I* "), the Supreme Court provided some clarification: "In determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling," meaning a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Furthermore, under *Tellabs,* courts must inquire "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*

As with any Rule 12(b)(6) motion, when assessing a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must accept all factual allegations in the complaint as true. *Id.* (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)).

## III. *REQUESTS FOR JUDICIAL NOTICE*

■ As a threshold matter, the Court considers the parties' requests for judicial notice. Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994).

■ Defendants request that the Court take judicial notice of 11 exhibits. Having reviewed the exhibits, the Court grants Defendants' request as to Exhibits 1 and 2, labels for Aranesp and Epogen taken from the FDA website, as documents "capable of accurate and ready determination" and "not subject to reasonable dispute." Fed.R.Evid. 201(b). The Court grants Defendants' request as to Exhibits 3–5, Amgen's 2004, 2005 and 2006 Form 10–Ks, since SEC filings are proper matter for judicial notice. *See Dreiling v. American Exp. Co.,* 458 F.3d 942, 946 (9th Cir.2006). Pursuant to the incorporation by reference doctrine, the Court takes judicial notice of Exhibit 6, *The Cancer Letter* article, Exhibit 7, the computer printout of the Interim Analysis of the DAHANCA study, Exhibit 9, a public health advisory posted on the FDA website, and Exhibit 10, a transcript of the May 4, 2004 FDA ODAC meeting. All these items were either referenced or quoted in the CAC. *See U.S. v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003). Exhibit 8 is an analyst report issued by Bernstein Research dated September 28, 2007. Among the public documents a court may consider in a motion to dismiss securities fraud claims are analyst reports when they are submitted to establish "whether

and when certain information was provided to the market," not the truth of the matters asserted in the reports. *See In re PetSmart, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 987 n. 1 (D.Ariz.1999). Because Plaintiffs do not dispute the authenticity of the analysts' reports, the Court grants Defendants' request to take judicial notice of Exhibit 8, to the extent the document is admissible. The Court takes judicial notice of Exhibit 11, a LexisNexis report showing Amgen's daily stock prices between April 1, 2004 and October 31, 2007 as listed on NASDAQ. *See In re Copper Mountain Securities Litigation,* 311 F.Supp.2d 857, 864 (N.D.Cal.2004).

▬▬▬ Plaintiffs request that the Court take judicial notice of Exhibits 1, 2, 3, 3A and 4. The Court grants Defendants request as to Exhibits 1 and 2, a proxy statement and Form 4s filed with the SEC on various dates. *See Dreiling,* 458 F.3d at 946. The Court denies Plaintiffs requests as to Exhibit 3, a Raw Data report downloaded from Thomson Financial reflecting the purchases and sales by Amgen insiders from February 17, 2000 to December 10, 2007, and Exhibit 3A, a "relevant subset of the data in the Raw Data Report." (Plaintiff's Request for Judicial Notice at 3.) These documents are neither "capable of accurate and ready determination, nor "not subject to reasonable dispute." Fed.R.Evid. 201(b). Finally, the Court takes judicial notice of Exhibit 4, a transcript of the May 2007 ODAC meeting, under the incorporation by reference doctrine. *See Ritchie,* 342 F.3d at 908.

## IV. *DISCUSSION*

### A. *Section 10(b) Claim*

Section 10(b) of the Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements § 10(b) by declaring it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

▬▬▬ Thus, in a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341–342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

1. *False or Misleading Statements Regarding the Safety of ESA's, Potential for Market Growth, and Risk of Adverse Action by ODAC*

Plaintiffs allege that Defendants made a series of false and misleading statements regarding their financial performance and the safety of their products. The alleged misrepresentations include: (1) Defendant Morrow's statements regarding the 2004 ODAC Meeting, (2) statements regarding the safety of Amgen's ESA products; and (3) statements about future growth. The Court will address each of these categories in turn.

*(a) April 22, 2004 Call With Analysts*

█ On April 22, 2004, Defendant Morrow, Amgen's Vice President of Global Communications Operations, made statements to Wall Street analysts during a conference call to discuss Amgen's first quarter 2004 results. When asked about the 2004 ODAC Meeting, Morrow stated that Amgen "had decided to participate in that meeting 'cause the focus was not on Aranesp and as Roger said late last year, there is no signal associated with Aranesp. We've has two perspective randomized placebo controlled trial. And the safety for Aranesp has been comparable to placebo." (CAC, ¶ 136.)

Plaintiffs allege that Morrow's statements were misleading because they either misrepresented or omitted: (a) that the focus of the FDA's inquiry was on the use of Amgen-manufactured ESAs in oncology patients in the U.S. market, as evidenced by the March 30, 2004 notice in the Federal Register, which stated that one of the two topics for the May 2004 ODAC meeting was "Safety concerns *associated with ARANESP* (darbepoetin alfa) Amgen, Inc. *and PROCRIT* (epoetin alfa) Ortho Biotech, L.P., both of which are indicated for the treatment of anemia associated with cancer chemotherapy;" (b) that in the absence of well-controlled trials demonstrating otherwise, the FDA would assume safety signals seen in earlier clinical trials applied to all ESA drugs, including Aranesp; and (c) that no clinical trials to date had been designed to test overall survival rates and other clinically significant metrics, and therefore did not provide a medically sound basis for the conclusion that "the safety for Aranesp has been comparable to placebo." (CAC, ¶ 137.)

Defendants point out that the agenda for the meeting was publicly available in the *Federal Register*, and that meeting itself was public and attended by the press. Thus, they assert that "the market could not have been misled by Morrow's speculations about what the FDA and the Committee were likely to do at the meeting." (Motion at 10.)

█ Though not labeled as such, Defendants appear to be asserting the "truth-on-the-market" affirmative defense. Under this theory, a defendant's failure to disclose material information may be excused where the information was made credibly available to the market by other sources. *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir.1991) (citing *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1115 (9th Cir.1989)). However, to avoid liability under this theory, "any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *Apple Computer*, 886 F.2d at 1116 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988)) (the presumption that a fraudulent statement has been transmitted through market price may be rebutted by a showing that "corrective statements" have "credibly entered the market").

█ As a general rule, the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis. *In re Thoratec Corp. Securities Litigation*, 2006 WL 1305226, at *10 (N.D.Cal.2006). Here, the Court finds dismissal at this state of the litigation inappropriate. The mere fact that the agenda for the 2004 ODAC meeting was available to the public, or that the meeting itself was public, is not enough to shield Defendants from liability.

Next, Defendants contend Plaintiffs have not met their burden of pleading the requisite scienter, since Plaintiff "does not allege any facts to suggest that Mr. Mor-

row did not genuinely believe what he was saying." (Motion at 19.) The Court disagrees, and finds that the factual allegations in the CAC, when considered cumulatively and in context, are sufficient to support a "strong inference" of deliberate recklessness. First, the March 30, 2004 notice in the *Federal Register* stated that one of the two topics for the May 2004 ODAC meeting was "Safety concerns *associated with ARANESP* (darbepoetin alfa) Amgen, Inc. *and PROCRIT* (epoetin alfa) Ortho Biotech, L.P., both of which are indicated for the treatment of anemia associated with cancer chemotherapy." (CAC, ¶ 137.) Yet Morrow told analysts the focus of the 2004 meeting was "not on Aranesp." From this, a strong inference arises that Morrow acted with "deliberate recklessness" in making such a statement.

Second, in 2003 and early 2004, data from two clinical trials testing ESAs on cancer patients in Europe, ENHANCE and BEST, raised concerns over the safety of the entire class of ESAs. (CAC, ¶ 55.) In the ENHANCE trial, patients with head and neck cancer had substantially shorter progression free survival and overall survival than a placebo group. (Id.) The BEST trial was stopped after only four months due to increased mortality in breast cancer patients receiving an epoetin alfa product. (Id.) According to the CAC, Amgen knew that unlike the BEST and ENHANCE trials, the clinical trials on which Aranesp's FDA approval was based were not designed for the purpose of assessing the survival rates of patients. (CAC, ¶¶ 55, 59–60.) Plaintiff allege that in the absence of well-controlled trials demonstrating otherwise, the FDA would assume that negative safety signals seen in the earlier clinical trials applied to all ESA drugs, including Aranesp. (CAC, ¶ 127.) These facts go directly to Amgen's culpable state of mind, and provide a cogent and compelling inference to support a finding of scienter.

■ In addition, Defendants challenge Plaintiffs' claim, arguing that the lack of market movement in the price of Amgen stock following the ODAC meeting precludes a claim of loss-causation. "Loss causation" is the causal connection between the material misrepresentation and the loss. *Dura Pharmaceuticals*, 544 U.S. at 341–342, 125 S.Ct. 1627. In order to show loss-causation, Plaintiffs must explain how Morrow's alleged misstatement caused purchasers of Amgen stock to suffer a loss. Ordinarily, this requires an allegation that there was a "corrective disclosure," followed by a drop in the price of the stock. *See Basic*, 485 U.S. at 249, 108 S.Ct. 978.

■ Having reviewed the CAC, the Court finds that Plaintiffs have met this pleading requirement. Plaintiffs have alleged a series of "corrective disclosures" in the form of articles and reports published by the *Associated Press*, the *New York Times*, the *Rocky Mountain News*, the *Boston Globe*, *Reuters*, *Bloomberg* and the FDA. (CAC, ¶¶ 104–108, 110–112, 11, 118–119). Although Plaintiffs acknowledge that "[t]hat there was no significant movement in Amgen's share price following the 2004 ODAC Meeting" (CAC, ¶ 64), according to the CAC, it was not until the May 10, 2007 ODAC Meeting that investors allegedly became aware of the full economic effects of Morrow's statements in 2004. Specifically, the CAC alleges that "[t]he 2007 ODAC Meeting for the first time informed investors about the serious safety concerns recognized by ODAC in 2004...." (CAC, ¶ 121.) Plaintiffs have also alleged a drop in the price of stock, by alleging that as news of the 2007 ODAC Meeting circulated, "shares of Amgen fell from $63.10 to $57.33 per share." (CAC, ¶ 127.)

*(b) Amgen's Statements About Future Growth in 2004 and 2005*

Next, Plaintiffs challenge a group of statements made to analysts in July and November 2004 and March 2005 about Aranesp's growth prospects. In a July 2004 conference, Defendants Sharer and Morrow stated that Amgen was moving ahead on clinical studies of Aranesp, and that they saw a "strong growth potential" for that particular product. (CAC, ¶¶ 151–152.) In November 2004, Amgen's CFO Nanula stated that Amgen was focused on growing the market for Aranesp, that it was seeking "additional indications," and that "we think the market has plenty of room to grow." (CAC, ¶ 153.) In March 2005, Dr. Anthony Gringer, Amgen's Senior Director of Scientific Research, noted that there were many patients suffering from chronic kidney disease who remained untreated, and for whom "Aranesp is an ideal treatment option." (CAC, ¶ 154.)

Defendants first argue that "these kinds of generalized expressions of optimism about future growth are, by their very nature, too vague to engender reliance by a reasonable investor and therefore are immaterial as a matter of law. (Motion at 13) (*citing Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 379 (9th Cir.2003)). In *Glen Holly,* the Ninth Circuit rejected plaintiff's fraud and negligent misrepresentation claims based on the defendant's statements "generally describing the 'high priority' [defendant] placed on product development and alluding to marketing efforts. . . ." *Id.* The court concluded that such statements "were generalized, vague and unspecific assertions, constituting mere "puffery" upon which a reasonable consumer could not rely." *Id.* (citations omitted).

Defendants' analogy to *Glen Holly* is unavailing. When viewed in context of all the facts alleged in the complaint, the statements in the CAC indicating the strong growth potential of Aranesp are much less generalized and vague than the "mere puffery" in *Glen Holly.* The CAC alleges several optimistic public statements made by Amgen, its officers, and the press between the dates of April 22, 2004 and May 10, 2007. "Optimistic statements may constitute a basis for a claim under section 10(b)." *In re Syntex Corp. Securities Litigation,* 95 F.3d 922, 926 (9th Cir.1996). Moreover, in *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093–94, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Supreme Court made clear that statements couched as opinion or belief may be actionable if the opinion is (1) known by the speaker to be false when made or (2) made without a reasonable basis in fact. The CAC asserts that the Defendants knew that the facts contravened their optimistic statements that Aranesp and Epogen had "growth potential" given the evolving safety profiles of ESAs. (CAC, ¶ 155.) The CAC also alleges that Defendants lacked a reasonable basis for projecting growth in sales of Aranesp or Epogen due to the substantial risk that the FDA would place greater limitations on the use of ESAs based on Amgen's failure to conduct the clinical trials recommended by ODAC in 2004. (Id.) On these facts, the Court concludes that Plaintiffs have adequately shown the materiality of Defendants' statements regarding growth.

Next, Defendants argue that Plaintiffs have not and cannot plead economic loss or loss causation with respect to these statements because Defendants' predictions of future growth proved to be accurate. For the years ending December 31, 2005 and 2006, Aranesp sales increased from $1.544 billion in 2003, to $2.473 billion in 2004, to $3.2723 billion in 2005, to $4.121 billion in 2006. Plaintiffs, however, do not dispute that revenue from Aranesp did grow for a number of years. Instead,

Plaintiffs assert that Amgen's growth projections were unsustainable in light of the Amgen's unsustainable off-label sales and the safety profile of ESAs. The CAC alleges inaccurate growth predictions because of Amgen's illegal marketing and misleading the marketing about ESAs' safety. (CAC, ¶¶ 57, 81, 84, 104–106, 108, 207). Because these statements "affirmatively create[d] an impression of a state of affairs which differ[ed] in a material way from the one that actually exist[ed]," the Court finds that Plaintiffs have sufficiently pled loss-causation. *In re Syncor Int'l Corp. Sec. Litig.*, 239 Fed.Appx. 318 (9th Cir. 2007). Moreover, Plaintiffs have sufficiently plead economic loss by alleging drops in the price of Amgen stock from March 2007 on, after the press began reporting on the FDA black box warnings and the anemia drug marketing. (CAC, ¶¶ 109, 114, 117–118, 127.)

Defendants also challenge Plaintiffs' claim on the basis that Plaintiffs have not alleged sufficient facts to show Defendants were not genuinely optimistic or lacked any reasonable basis for optimism about Aranesp. To the contrary, the CAC alleges that Defendants' statements regarding future growth were untenable given all the Amgen knew about the evolving safety profile of ESAs.

Finally, Defendants argue that their predictions of growth were "forward-looking statements," and Plaintiffs have failed to allege facts sufficient to give rise to a strong inference that any of the three speakers quoted—Sharer, Morrow and Nanula—knew their forward looking statements were materially misleading.

Forward-looking statements include predictions or speculations about the future. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir.2008) (hereinafter referred to as *"Tellabs II"*). Under the PSLRA's "safe harbor" provisions, plaintiffs must prove that "forward-looking" statements were made with "actual knowledge" that they were false or misleading. *Silicon Graphics*, 183 F.3d at 993 (citing 15 U.S.C. §§ 78u–5(c)(1)(B), 77z–2(c)(1)(B)).

■ Here, although Plaintiffs' Opposition fails to adequately address this argument, the Court, upon careful review of the entire CAC, concludes that Plaintiffs' factual allegations demonstrate that Sharer, Morrow and Nanula made their statements with "actual knowledge" that they were false or misleading. In particular, during the 2004 ODAC meeting, "the FDA communicated to Amgen that for the ESA safety issue to get resolved, Amgen and J & J should conduct clinical trials that met a number of pre-specified criteria, which the FDA delineated ... and also made clear that another important parameter was to test ESAs at target hemoglobin levels approved by the FDA." (CAC, ¶ 61.) Yet, by the 2007 ODAC meeting, "no completed or ongoing trial [had] addressed safety issues of ESAs in cancer patients with chemotherapy-associated anemia using currently approved dosing regimes in a generalizable tumor type." (CAC, ¶ 122.) These facts give rise to the inference that Sharer, Morrow and Nanula had "actual knowledge" that their statements to analysts in 2004 and 2005—that "it was seeking additional indications," that "we think the market has plenty of room to grow" (CAC, ¶ 153), and that "Aranesp is an ideal treatment option" (CAC, ¶ 154)—were false or would mislead the public.

Plaintiffs have also alleged facts giving rise to the inference that the Individual Defendants had "actual knowledge" that the statements projecting sales growth were would mislead the public, since those sales largely stemmed from Amgen's scheme of illegally marketing Aranesp for *"unapproved* indications and populations."

(CAC, ¶ 81.) These facts include allegations that "Amgen sales representatives were trained to prompt doctors to ask questions that would permit them to begin the off-label dialog" (CAC, ¶ 85), that Amgen "provided its sales staff with detailed information about off-label uses in the form of 'color-coded spreadsheets, Power Point presentation and unpublished study results' to insure they 'were prepared to discuss any off-label topic" (CAC, ¶ 87), and that Amgen marketed off label uses via a speakers program, where Amgen paid "experts" to talk about off-label uses of Aranesp to physicians and other speakers in attendance." (CAC, ¶ 89). Given these allegations, Plaintiffs have sufficiently demonstrated that Sharer, Morrow and Nanula had "actual knowledge" that their forward looking statements were materially misleading.

### (c) Statements that On–Label Use of Aranesp was Safe

■ Between November 20, 2006 and May 3, 2007, Defendants made various statements about the safety of on-label use of Aranesp and Epogen. (CAC, ¶¶ 139–148.) Each of these statements was a variant of the same theme—that even though there were reports of safety concerns in studies involving off-label uses, "[i]t is certainly our very, very strong conviction that our products are very safe when used on label." (CAC, ¶ 147.) Plaintiffs allege that these statements were false or materially misleading because at the time the statements were made, there was not sufficient evidence to show that Aranesp and Epogen were safe when used on-label. (CAC, ¶ 149.)

Defendants argue that Plaintiffs offer no factual allegations that give rise to an inference that Amgen did not genuinely believe in the safety of Aranesp and Epogen for on-label use. The Court disagrees. Plaintiffs allege that during the class period, Amgen was aware that well-designed clinical trials, including the DAHANCA 10 trial, indicated substantial safety concerns with Aranesp and Epogen. (CAC, ¶¶ 64, 67, 149) Plaintiffs also allege that during the 2004 ODAC meeting, the FDA communicated to Amgen that in order to resolve the ESA safety issue, it should conduct clinical trials that met a number of pre-specified criteria. (CAC, ¶ 61.) Amgen, however, failed to conduct these studies. (CAC, ¶ 149.) Taken as a whole, the facts alleged by Plaintiffs give rise to a strong inference that Defendants knew, or were reckless in failing to realize, their statements regarding on-label use of Aranesp were false and material to investors.

### 2. Defendants' Omissions Concerning the DAHANCA 10 Trial

The DAHANCA study involved the off-label use of Aranesp during curative radiotherapy to test whether the outcomes of patients suffering from head and neck cancer improved. (CAC, ¶ 64.) Plaintiffs allege that Amgen made material omissions of fact when it failed to timely disclose the adverse outcomes of the DAHANCA 10 Trial after learning about these adverse outcomes on October 18, 2006 and December 1, 2006. (CAC, ¶ 129.) On October 18, 2006, DAHANCA investigators temporarily halted the study "due to information about potential unexpected negative effects related to immunohistochemical estimation of the so-called EPO receptor." (CAC, ¶ 64.) On December 1, 2006, DAHANCA investigators decided to terminate the study entirely, based in part on "a trend towards impaired survival in an interim analysis." (CAC, ¶ 65.) The DAHANCA 10 Interim Analysis cited "a small but significant poor outcome in the patients treated with Aranesp," in that their tumor growth was worse than it was for patients not treated with Aranesp. (Id.)

■ Omissions are actionable under the Securities Exchange Act § 10(b) and

Rule 10b–5 thereunder only if the party omitting the fact had a duty to disclose that fact. *Chiarella v. U.S.*, 445 U.S. 222, 230, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Rule 10b–5 "imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir.1992). Furthermore, "[t]o be actionable under securities law, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir.2002).

■ Plaintiffs point to several instances where Amgen spoke publicly about their products. At the 2004 ODAC Meeting, Amgen allegedly held out the DAHANCA 10 Trial, one of five trials in the "Amgen Pharmacovigilance Program," as being material to resolving the FDA's concerns over safety signals with the ESAs. (CAC, ¶ 67.) David Parkinson, M.D., Amgen's Vice President, Oncology Clinical Development, described the Amgen Pharmacovigilance Program as "a responsible and credible approach to definitely resolving the questions raise[d] in this morning's meetings." (CAC, ¶ 62.) On other occasions, Amgen made statements regarding the safety of their products when used on-label. For example, on November 20, 2006, Amgen made a web posting stating that "[a] very substantial body of evidence, developed over the past 17 years, demonstrates that anemia associated with chronic kidney disease can be treated safely and effectively with EPOGEN and ARANESP, when administered according to the Food and Drug Administration (FDA)-approved dosing guidelines. . . ." (CAC, ¶ 75.) On January 25, 2007, during an earnings call with analysts, Defendant Morrow stated:

In 2007, we will once again focus on anemic chronic kidney disease and chemotherapy inducted patients not currently being treated . . . Roger did discuss the anemia of cancer, clinical findings and its far too early for us to assess any potential impact on the marketplace. . . .

(CAC, ¶ 77.) On February 16, 2007, during a call with analysts concerning *The Cancer Letter* and DAHANCA 10, Defendant Sharer stated, "We strongly believe, as we have consistently stated, that Aranesp and Epogen are safe and effective medicines to use in accordance with label indications." (CAC, ¶ 77.)

Plaintiffs argue, and this Court agrees, that Defendants had a duty to disclose the decision to temporarily halt the DAHANCA 10 trial on October 18, 2006. Defendant's statements indicating that the Amgen Pharmacovigilance Program, including the DAHANCA 10 Trial, would resolve questions raised at the 2004 ODAC Meeting regarding the safety of ESAs, triggered the duty to disclose. By not disclosing the temporary halting of the trial, Defendants created the false impression that the DAHANCA 10 Trial was proceeding smoothly when in fact it had been halted due to safety concerns.

For the same reasons cited above, Defendants also had a duty to disclose the DAHANCA investigators' decision to terminate the study entirely. In arguing that Amgen was not required to disclose the results of the study, Defendants highlight that the Interim Analysis was posted on DAHANCA's website on December 1, 2006. Defendants thus contend they cannot be liable for securities fraud for failing to disclose publicly available information. *See Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 976–977 (9th Cir. 1999). As discussed previously, that the DAHANCA 10 results were posted on its

website does not mean the market *knew* of these results. Indeed, the headline of *The Cancer Letter's* article on February 16, 2007—"Danish Researchers Post Long–Awaited Aranesp Results—Ever So Discreetly"—strongly suggests that the results of study were not conveyed to the market with sufficient "intensity and credibility" to effectively counteract previous statements that the study would clarify whether ESA's were safe when used on-label. *See In re Apple Computer Securities Litigation,* 886 F.2d at 1116.

Defendants further argue that they did not publicize the Interim Analysis because they reasonably believed it was premature to do so. They justify nondisclosure based on the "interim" nature of the report, and the fact that it did not contain any underlying data. Defendants contend that nothing in the Interim Analysis "provided statistically significant evidence that the ill effects may be caused by—rather than randomly associated with—use of [Aranesp] and are sufficiently serious and frequent to affect future earnings." (Motion at 20.) The Court concludes, however, that at the very least, early termination of the DAHANCA 10 Trial indicated to Defendants that they could not use the study results to respond to the FDA's inquiry whether ESAs are safe when used on-label.

Defendants set forth the same arguments regarding scienter, contending that Amgen did not publicize the Interim Analysis because it reasonably believed it was premature not to do so and not material. Given the Interim Analysis' finding that tumor growth was worse for patients who took Aranesp than for those who did not, and the "trend towards impaired survival" in those patients, the Court finds that Plaintiffs have sufficiently raised a "strong inference" that Defendants' understood their omission would mislead the market.

### 3. *Defendants' Statements Regarding the 103 Study*

The 103 Study tested the off-label use of Aranesp, and was "designed to show ... that Aranesp could reduce the frequency of transfusions and improve quality of life" in patients whose anemia was caused by cancer, as opposed to a cancer treatment such as chemotherapy or radiation. (CAC, ¶ 70.) On January 25, 2007, after Amgen knew the results of the DA-HANCA 10 Trial but before *The Cancer Letter* had published those results, Amgen held a conference call with analysts to discuss its fourth quarter 2006 earnings. (CAC, ¶ 69.) During this call, Defendant Perlmutter, Amgen's Executive Vice President of Research and Development, disclosed the results of the 103 Study:

> We did not show a statistically significant reduction in transfusions in this patient population at the 16–week endpoint. Moreover, we did see a statistically adverse effect of Aranesp on overall mortality in this patient population, and so we conclude that the risk benefit ratio for Aranesp in these extremely ill patients with anemia secondary to malignancy is, at best neutral and perhaps negative.

(CAC, ¶ 70.)

Plaintiffs argue that Perlmutter's statements on January 25, 2007 were misleading to the market, since he described the results of the study as "neutral, and perhaps negative," when in fact the study was a failure. In response, Defendants contend that his statements in no way misled investors, and in fact characterized the study in a way that made it "crystal clear" that the study did not support (as Amgen had hoped) the expansion of the label to treat anemia of cancer. (Motion at 22.) While this may appear to be the case when viewing the statements in isolation, under *Tellabs I,* "courts must consider the com-

plaint in its entirety." *Tellabs I,* 127 S.Ct. at 2509. By the time Perlmutter made these statements at the conference call, he knew that back in December 2006, DA-HANCA investigators had decided to terminate the study based in part on "a trend towards impaired survival in an interim analysis." (CAC, ¶ 65.) Furthermore, Amgen was aware that the 103 Study was more akin to what the FDA was looking for in 2004, since it involved on-label rather than off-label dosages. (D's RJN, Ex. 10:109:15–110:21). Given the CAC's other allegations, Plaintiffs have raised a strong inference that Perlmutter knew his statements were false when made. That is, considering the opposing inference favoring Defendants—that Perlmutter did not know his statements were false or materially misleading—the Court finds that a reasonable person would deem Plaintiffs' inference of scienter at least as cogent and compelling as Defendants.

### 4. *Improper Marketing for Off-Label Uses*

 Plaintiffs contend that Defendants are liable under § 10(b) for representing in Amgen's SEC filings and other public statements that Amgen markets Aranesp and Epogen for "their approved indications" and in a manner "consistent with the FDA label," when in reality, Amgen was pushing their off-label uses. (CAC, ¶¶ 81–101.) Defendants argue these claims fail for four reasons.

First, Defendants argue that Plaintiffs' reliance on anonymous witnesses defeats any attempt to comply with the "strong inference" scienter requirement of the PSLRA. In *Tellabs I,* the Supreme Court recognized that the PSLRA's "strong inference" standard unequivocally raised the bar for pleading scienter. *Tellabs I,* 127 S.Ct. at 2509. Noting that Congress did throw much light on what facts suffice to create a strong inference, the Supreme Court held that a complaint could survive

"only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510. The Seventh Circuit in *Higginbotham v. Baxter Intern., Inc.,* 495 F.3d 753, 756 (7th Cir.2007) construed this to mean the court must discount allegations from confidential witnesses, since "anonymity conceals information that is essential to the sort of comparative evaluation required by *Tellabs.*" *Id.* at 757. However, noting that *Tellabs I* instructs courts to evaluate the allegations in their entirety, the Seventh Circuit concluded that "allegations from 'confidential witnesses' must be 'discounted' rather than ignored," and that "[u]sually that discount will be steep." *Id.*

After the Supreme Court reversed the Seventh Circuit's dismissal of *Tellabs I,* the Seventh Circuit revisited the issue of whether the plaintiffs' allegations of securities fraud created the "strong inference of scienter." *Tellabs II,* 513 F.3d at 704. In doing so, the court distinguished *Higginbotham* and its "steep" discounting of allegations by confidential witnesses. *Id.* at 711. Whereas *Higginbotham*'s confidential sources included "three ex-employees" and "two consultants" of the defendant, *Tellabs II* involved confidential informants whom the Seventh Circuit described as "numerous and consist[ing] of persons who from their job descriptions were in a position to know at first hand the facts to which they are prepared to testify." *Id.* These informants "set forth in convincing detail" the information they had obtained. *Id.* at 712. While the court noted that it would be better had the informants been named in the complaint, "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertion." *Id.* at 712 (*citing In re Daou Systems, Inc.,* 411 F.3d

1006, 1015–1016 (9th Cir.2005); *other citations omitted* ).

The confidential witnesses in the instant case are more like those in *Tellabs II* than in *Higginbotham.* In the CAC, confidential witness ("CW") # 1, a former Amgen district sales manager based in Florida, states that his regional manager provided him with a "sales aid," written for Amgen sales personnel. (CAC, ¶ 86.) This "sales aid" provided a list of "excellent questions" to ask Amgen customers, including, among others: "What is keeping you from using Aranesp in all your MDS/HIV/CIA patients?"; "Why have you not tried Aranesp in your MDS/HIV/CIA patients?"; and "How can we break you if this habit you have developed? Can we come up with a list of MDS/HIV/CIA pts that you can target to try Aranesp?" (Id.) According to CW# 2, a former Amgen interim district sales manager in Houston, Amgen ostensibly repudiated off-label promotion of Epogen and Aranesp, but provided its sales staff with "color coded spreadsheets, Power Point presentations and unpublished study results," to insure they "were prepared to discuss any off-label topic." (CAC, ¶ 88.) CW# 4, a former oncology sales representative at Amgen in New Jersey, explained that Amgen would sponsor speakers programs for doctors, clinic managers and pharmaceutical directors in order to advance off-label uses. (CAC, ¶ 91.)

The Court concludes that Plaintiffs have pled facts raising the strong inference that Defendants were surreptitiously marketing the off-label uses of Aranesp and Epogen. The Complaint designates the confidential witnesses' job titles and the region in which they worked, and sets forth in "convincing detail" the information these informants have obtained. Although allegations against anonymous informants are often difficult to assess, here, the absence of their names does not invalidate the strong inference derived from the informants' assertions.

■ Second, Defendants assert that Plaintiffs' claims constitute an impermissible attempt to enforce the Federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, an area in which the FDA has exclusive authority. Doctors may legally prescribe FDA-approved drugs for off-label purposes, and manufacturers may lawfully disseminate information concerning off-label uses of drugs to doctors in response the questions. Therefore, Defendants contend, to state a claim for material falsity, Plaintiffs would have to show a material portion of Amgen's sales of Aranesp was the result of "improper and illegal marketing practices," a judgment that can only be made by the FDA.

■ Defendants are incorrect in their assertion that the FDA has exclusive authority to enforce Plaintiffs' claims. The issue before the Court is not whether the FDA improperly approved Amgen's products as safe and effective, but rather whether Defendants violated securities laws by improperly marketing Epogen and Aranesp for off-label uses. "The FDA has no jurisdiction, primary or otherwise, to decide whether disclosures in the market violate the securities laws." *In re Genetech, Inc., Securities Litigation,* 1989 WL 106834 (N.D.Cal.1989). Consequently, the FDA does not preempt Plaintiffs' claims.

■ Third, Defendants argue that Plaintiffs have failed to allege a strong inference of scienter to the Individual Defendants. Plaintiffs have presented evidence that Amgen's marketing scheme emanated from its national office. (CAC, ¶¶ 86, 89–91, 101, 157.) These allegations, together with other facts asserted in the complaint, such as the widespread and lucrative nature of scheme, and the various

press releases in which Amgen affirmed it only promoted Aranesp and Epogen in accordance with the FDA label, support a strong inference that Amgen executives were aware of the alleged marketing scheme and acted with deliberate recklessness. *See In re Ramp Networks, Inc. Securities,* 201 F.Supp.2d 1051, 1076 (N.D.Cal.2002).

Finally, Defendants challenge causation, arguing that Plaintiffs fail to plead disclosure of the off-label marketing and therefore cannot plead a drop in Amgen's stock price after the disclosure. To the contrary, the CAC alleges that at the 2007 ODAC Meeting, members of ODAC "expressed concern regarding ... reports of improper marketing practices by Amgen and J & J. Immediately following this disclosure, Amgen's stock price dropped $5.77 per share, or 9.1% to $57.33." Under *Dura Pharmaceuticals,* Plaintiffs need only allege that the company's stock price dropped after the truth became known. *Dura Pharmaceuticals,* 544 U.S. at 347, 125 S.Ct. 1627. Under this standard, the Court finds that Plaintiffs have sufficiently pled causation.

### 5. *Amgen's SEC Statements*

Plaintiffs assert that during the Class Period, Amgen issued false and misleading statements with the SEC. (CAC, ¶¶ 165–176.) Plaintiffs do not contest the accuracy of figures reported, but rather argue that the misrepresentations and omissions concerning safety problems with the ESAs, nondisclosure of the risk of adverse action by the ODAC and FDA, misrepresentations and omissions concerning adverse clinic trial results and misrepresentations concerning market practices deceived investors as to the "quality and nature of Amgen's earnings and revenues." (CAC, ¶ 177.)

In response, Defendants argue that as a matter of law, a § 10(b) violation cannot be premised upon a company's disclosure of accurate historical data. (Motion at 26.) "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *In re Convergent Technologies Securities Litigation,* 948 F.2d 507, 512 (9th Cir.1991) (quoting *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990)). Incomplete statements are misleading if they "affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002).

Defendants' statements meet this standard. Defendants repeatedly represented in their SEC filings that Amgen marketed its products "for their approved indications" (CAC, ¶¶ 10, 83, 187) while at the same time promoted unapproved uses and increased per-patient dosages through improper means (CAC, ¶¶ 84–103.) Thus, Defendants misled investors by implicitly and falsely warranting that there were no illegal practices contributing to that success. *See In re Syncor Intern. Corp. Securities Litigation,* 239 Fed.Appx. 318, 320 (9th Cir.2007) (*citing In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388, 400–01 (S.D.N.Y.2005); *In re Providian Fin. Corp. Sec. Litig.,* 152 F.Supp.2d 814, 824–25 (E.D.Pa.2001)). The Court concludes that these facts alleged in the CAC sufficiently support an inference of scienter to survive a motion to dismiss.

### 6. *Individual Defendants' Trading Activities*

In an attempt to reinforce its allegations of scienter, Plaintiffs next focus on the

Individual Defendants' stock sales by charting the date, number of shares, and market value of the shares that each Defendant sold during the Class period. (CAC, ¶ 178.)

■■■■■■ Unusual or suspicious stock sales may be circumstantial evidence of scienter when the level of trading is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Vantive Corp. Securities Litigation*, 283 F.3d 1079, 1092 (9th Cir.2002) (quoting *Ronconi*, 253 F.3d at 435). Among the relevant factors to consider in making this determination are: "1) the amount and percentage of shares sold by insiders; 2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history." *Id.* (internal quotation and citation omitted).

Although Plaintiffs' chart shows millions of dollars in Amgen stock sales by the Individual Defendants, the Court finds that none of the stock sales histories of any of the insider defendants is properly pled to support an inference of scienter. Plaintiffs' chart does not address "whether the sales were consistent with the insider's prior trading history," or whether Defendants' traded "at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* In sum, the Individual Defendants' stock sales neither add nor detract from Plaintiffs' scienter arguments.

### 7. *Group Pleading Doctrine*

■■■■ Defendants next take issue with Plaintiffs' group pleadings, arguing that the § 10(b) claim fails against the Individual Defendants because Plaintiffs have not alleged sufficient facts (1) to show that each Individual Defendant was responsible for making one or more of the statements challenged; or (2) to give rise to a strong inference that any Individual Defendant acted with scienter.

Plaintiffs' group pleading includes allegations that the Individual Defendants, "because of their positions of control and authority as senior and executive officers and directors of the Company, had access to the adverse undisclosed information about its business, operations, products and prospects ..." (CAC, ¶ 23.) Plaintiffs also allege that the Individual Defendants "participated in drafting, preparing, and/or approving the public reports and other statements and communications complained of herein...." (CAC, ¶ 25.) Aside from these allegations of general liability based upon the Individual Defendants' positions, Plaintiffs assert that Sharer, Nanula, Fritzky, Omenn, and Johnson "signed the Company's Annual Report on Form 10–K" during the Class Period. (CAC, ¶¶ 14–15, 20–22).

■■■■■ "Group published information" is information contained in documents such as prospectuses, registration statements, annual reports and press releases. *See Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987). The "group published information" presumption allows plaintiffs to rely "upon a presumption that the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors." *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir.1995). "To rely upon the 'group published information' presumption, Plaintiffs' complaint must contain allegations that an outside director either participated in the day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." *In re GlenFed, Inc. Securities Litigation*, 60 F.3d 591, 593 (9th Cir.1995).

There is significant debate among the various circuits over whether the group pleading doctrine survived the heightened pleading requirements of the PSLRA. *See. e.g. Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364 (5th Cir.2004) (no group pleading); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (S.D.Cal.1998) (no group pleading); *Danis v. USN Communications, Inc.*, 73 F.Supp.2d 923, 939 n. 9 (N.D.Ill.1999) (group pleading continues after the PSLRA). Defendants urge this Court to follow the Third, Fifth and Seventh Circuits, which have held that the group pleading doctrine does not apply since enactment of the PSLRA with its heightened pleading standards for scienter. *See Winer Family Trust v. Queen*, 503 F.3d 319, 334–337 (3d Cir.2007); *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir.2006); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir.2006), *rev'd on other grounds*, — U.S. —, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). These courts reason that group pleading is inconsistent with the PSLRA, which requires that allegations be set forth with particularity concerning "the defendant" and scienter be pleaded for "each act or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state of mind." *Id.*; 15 U.S.C. § 78u–4(b)(2).

The Ninth Circuit has not addressed the issue of whether the group pleading doctrine survives the PSLRA. Some courts in this district have questioned the continuing vitality of the group-pleading doctrine. *See Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (S.D.Cal.1998). However other courts, including the Ninth Circuit in *Silicon Graphics*, have not contested that the group pleading doctrine survives the PSLRA. *See In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746, 759 (N.D.Cal.1997) (applying doctrine to officers and members of executive committee after enactment of PSLRA); *see also, In re PETsMART, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 997 (D.Ariz.1999) ("the doctrine survives the PSLRA"); *Pegasus Holdings v. Veterinary Ctrs. of Am., Inc.*, 38 F.Supp.2d 1158, 1165 (C.D.Cal.1998) ("non-speaking defendants may be held liable on a 'group pleading' theory"); *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1108 (D.Nev.1998) (holding that PSLRA did not abolish doctrine, and applying it to those with high level positions within a company).

Having reviewed both sides of the issue, the Court is most persuaded by the Seventh Circuit's reasoning in *Tellabs*, 437 F.3d 588. There, in asking whether group pleading was still viable after the passage of the PSLRA, the court found its answer in the language of the statute. *Id.* at 602. Section 78u–4(b)(2) requires that the complaint "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." *Id.* at 602. Quoting the Fifth Circuit, the court explained that the statute's references to "the defendant" may only reasonably be understood to mean "each defendant" in multiple defendant cases. *Id.* So in order to create a strong inference of scienter, plaintiffs had to create this inference with respect to each individual defendant in multiple defendant cases. *Id.*

Joining the Third, Fifth and Seventh Circuits, this Court holds that group pleading presumption no longer applies since the passage of the PSLRA. The only allegations against outside directors Fritzky, Omenn and Johnson, and non-speaking officers Fenton and McNamee, are those contained in the CAC's group pleading allegations. Having concluded that the group pleading doctrine is no longer viable, Plaintiffs have failed to state claims as to these Individual Defendants.

Accordingly, the Court DISMISSES these Defendants, without prejudice.

### B. *Section 20(a) Claim*

Section 20(a) of the Exchange Act confers liability on those who direct others to commit violations of the Exchange Act:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In order to allege a violation of § 20(a), a plaintiff must establish a strong inference of (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000). Scienter is not an element of control person liability; instead, a defendant may assert the affirmative defense of good faith by establishing the absence of scienter. *Id.* "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* (citations omitted).

Here, the first element of a § 20(a) claim is satisfied because, as discussed above, the CAC has adequately alleged a primary violation by Amgen under § 10(b) and Rule 10b–5. However, Plaintiffs have satisfied the second element only as to some of the Individual Defendants.

A person exercises control over an issuing corporation when he or she oversees day-to-day company operations. *Howard,* 228 F.3d at 1065. While an individual's status as an officer or director of the issuing corporation is insufficient, standing alone, to demonstrate the exercise of control, *Id.,* persuasive authority indicates that an officer or director who has signed financial statements containing materially false or misleading statements qualifies as a control person. *See In re Metropolitan Securities Litigation,* 532 F.Supp.2d 1260, 1296–1297 (E.D.Wash.2007) (*citing In re Alstom SA,* 406 F.Supp.2d 433, 487–488 (S.D.N.Y.2005)); *New Jersey and its Div. of Investment v. Sprint Corp.,* 314 F.Supp.2d 1119, 1144 (D.Kan.2004); *In re Enron Corp. Sec. Litig.,* 258 F.Supp.2d 576, 598 (S.D.Tex.2003)(citing cases); *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 437 (S.D.N.Y.2001).

The CAC asserts that Sharer and Nanula, both of whom were executives of Amgen, signed SEC financial statements during the Class Period. (CAC, ¶¶ 14–15). Moreover, the CAC alleges that all the Individual Defendants held positions of control, and that they "participated in drafting, preparing, and/or approving public reports and other statements and communications complained of" (CAC, ¶ 24), "were and able to and did control the content of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period" (CAC, ¶ 25), and "were acting on behalf of the Company in the regular course of business" (CAC, ¶ 28.) These allegations are sufficient to satisfy the second element of a § 20(a) claim against Sharer, Nanula, Perlmutter and Morrow.

As to outside director Defendants Fritzky, Omenn and Johnson, and non-speaking Defendants Fenton and McNamee, Plaintiffs cannot satisfy the second element of § 20(a) claim against them since the Court has dismissed the § 10(b)

claims against them. Accordingly, the Court also dismisses the § 20(a) claim against these Individual Defendants.

## V. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS in part and DENIES in part Defendants' Motion to Dismiss the CAC.

1. The Court GRANTS Defendants' Motion to Dismiss as to Individual Defendants Fritzky, Omenn, Johnson, Fenton, and McNamee. These Defendants are hereby DISMISSED from Plaintiff's § 10(b) and § 20(a) claims, without prejudice.

2. The Court DENIES Defendants' Motion to Dismiss as to Individual Defendants Sharer, Nanula, Perlmutter and Morrow.

3. The Court DENIES Defendants' Motion to Dismiss Plaintiffs' § 10(b) and § 20(a) claims.

The Court grants Plaintiffs leave to amend the CAC to address the deficiencies identified by this Order. *See Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995) (leave to amend generally granted unless pleading could not possibly be cured by alleging other facts). Plaintiffs may file a second amended consolidated complaint within 30 days of this Order.

IT IS SO ORDERED.